**Michael Dean OVERSTREET, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

**No. 41S00–9804–DP–217.**

Supreme Court of Indiana.

Feb. 24, 2003.

Teresa D. Harper, Bloomington, IN, Jeffrey Baldwin, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Timothy W. Beam, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Defendant Michael Dean Overstreet was convicted of murder, rape, and criminal confinement and sentenced to death for abducting, sexually assaulting, and killing a young woman. The principal aggravating circumstance supporting the sentence is intentional murder while committing rape. In this opinion, we review Defendant's claims that evidence against him was improperly admitted at his trial, that the evidence was insufficient to sustain the conviction for rape, and that he should not have been sentenced to death. Our review finds his claims unavailing and we affirm the convictions and death sentence.

### Background

Many of Defendant's claims in this appeal relate to the way in which the evidence against him was obtained or presented at trial. As such, we begin with a rather detailed review of that evidence.

The facts, presented in the form most favorable to the trial court's judgment, indicate that at 10:00 p.m. on September 26, 1997, 18–year old Eckart finished her shift at Wal–Mart. Her boyfriend, Anthony Evans, and his mother met her after her shift and the three shopped at the Wal–Mart for about an hour. Afterward, Eckart decided to go home because it was late. Evans decided to go home as well.

Eckart and Evans left for their respective homes in separate cars. Both headed north on U.S. 31 but Eckart turned right onto Earlywood Drive and Evans continued north on U.S. 31. Evans testified that he did not see her alive again.

Between midnight and 12:30 a.m., Eckart's car was found at the intersection of Graham and Earlywood Drive by two passers-by. The car was slightly off the

road, its lights were on, the keys were in the ignition, and Eckart's purse was on the car seat. The police were called to investigate.

Franklin Police Officer Michael Moore drove to the scene and saw Eckart's car on the side of the road. The car's rear bumper had been damaged but the car was otherwise still in working order. Eckart's mother, Connie Sutton, testified that she had not noticed the mark on the car before. Police searched the area but did not find Eckart.

Defendant's brother, Scott Overstreet, testified that Defendant telephoned him sometime after midnight on September 27, 1997, and asked him to come to the Franklin Days Inn because his car had broken down and he needed a ride home. When Scott arrived at the hotel, Defendant approached him. Defendant said that he and his "girlfriend" had been drinking and asked Scott to drive him and his girlfriend to Edinburgh in Defendant's van. In the periphery of his vision, Scott saw something white in the back of the van.

Scott further testified that as he was driving southbound on Highway 31 toward Edinburgh, Indiana, Defendant asked him to drive to Camp Atterbury instead because he had "taken a girl" and was going to take her into the woods and get her lost. (R. at 3223, 3226, 3229.) Scott followed Defendant's directions, finally stopping at a gravel turnaround in Camp Atterbury. Defendant asked Scott to come pick him up in two hours but Scott refused. Defendant then told Scott to have Defendant's wife, Melissa Overstreet, pick him up at the Atterbury shooting range in two hours. Scott placed his hands over his face while Defendant got out of the van.

After hearing the sliding door to the van close, Scott drove to Defendant's home and gave Melissa Defendant's instructions. Melissa drove Scott back to his car at the Days Inn. She then returned home to ask Scott's wife to baby-sit while she went to pick up Defendant.

Melissa testified that before driving to the shooting range, she searched the van and found several empty shell casings and a container of mace that she had not seen before that night. Melissa then drove to the shooting range where she found Defendant sweating with his flannel shirt unbuttoned. He was also carrying a blanket and had a gun strap over his shoulder.

When Defendant and Melissa arrived home, Defendant immediately went into the bathroom. He came out, undressed, and went to bed. Later that night, Scott called Defendant's home two or three times because he wanted his wife to come home. After one of these calls, Defendant got on the phone. Scott told Defendant that he had said "some pretty fucked up stuff." (R. at 3234.) Defendant explained that he could not get caught because he had a child and a wife and that his "girlfriend" had a boyfriend and lived with her father. Defendant then hung up the phone, got dressed, and walked out of the house. An hour or so later, Melissa heard the van return. Defendant came back in the house, and went back to bed.

The following Monday, September 29, 1997, Defendant told Melissa that he wanted to clean the van. After going to Defendant's father's house to borrow money, Defendant, Melissa, and their children drove to Mike's Express Car Wash. Defendant spent about an hour cleaning and vacuuming the inside rear of the van. When Melissa started cleaning the front of the van, Defendant told her not to worry about it.

Melissa testified that in the days after Eckart's disappearance, Defendant watched the news with increased frequency. He would sit in front of the television,

flipping from channel to channel, watching news coverage. When a station was airing a story on Eckart, he would watch it and after the story was finished he would resume switching channels. Melissa stated that Defendant "got to the point where he knew which channel was going to have the coverage over Kelly Eckart first." (R. at 3886.) Defendant also wanted to read news articles concerning Eckart. When he finished reading a story on Eckart, he would usually stop reading the newspaper.

On September 30, 1997, Shelia Woodcock and Pat Burks were looking for some puppies they had seen on the side of the road in Camp Atterbury. Instead, Shelia Woodcock found Eckart's body lying in a ravine. She reported the discovery to the police.

Indiana State Police Trooper J.D. Maxwell went to the scene. He found Eckart with her bib overalls down around her ankles. She was wearing her bra and panties and her white shirt was tucked in the back of her bra. She also had a ligature around her neck.

On October 18, 1997, Franklin Chief of Police found Eckart's shoes and socks stuffed into a pit toilet at Camp Atterbury.

On November 6, 1997, police received a tip that Scott had information about Eckart's murder. Scott voluntarily recounted what happened that night and directed the officers to the gravel turnaround where he had left Defendant on the morning of September 27, 1997. In a search of the area, the officers found Eckart's glasses, hair scrunchie, pager, necklace, locket, earring posts, and buttons from her overalls.

On November 7–8, 1997, the Franklin Police Department executed search warrants on Defendant's home. The police seized a hand-drawn map of Camp Atterbury and a blanket from the living room.

They also seized a carpet standard from Defendant's van for analysis. The fibers were found to match fibers found on Eckart's shirt and overalls. The officers also measured the height of the van's front bumper and found that, at 15–22 inches off of the ground, it was at the same height as the damaged area of Eckart's car.

Doctor Michael Allen Clark later conducted an autopsy and discovered that Eckart's shoestring and a strap to her bib overalls had been wrapped around her throat. He also found a circular wound in the forehead consistent with a gunshot wound. In addition, he discovered numerous post-mortem abrasions that were caused by dragging her body on the ground. He concluded that the cause of Eckart's death was ligature strangulation. The time of death was estimated to be between 11:00 p.m. on September 26, 1997, and 6:38 a.m. on September 27, 1997.

Dr. Clark also conducted a sexual assault examination consisting of taking swabs from Eckart's mouth, vagina, and anus. He made slides of each and examined them for the presence of sperm. He identified the presence of semen in the vaginal test but not in any of the others.

After preparing these slides, Dr. Clark gave them to the evidence technician, Trooper Maxwell. Trooper Maxwell placed the swabs on individual envelopes to dry. During the drying process, a lab attendant moved them across the room. Trooper Maxell then placed the swabs in different envelopes without knowing whether he placed the swabs in the corresponding anal, mouth, and vaginal envelopes.

Paul Misner, an Indiana State Police serologist, analyzed the swabs and slides from Eckart's sexual assault kit. Based on his evaluation of the slide and his knowledge, experience, and training, he determined that Maxwell had placed the

vaginal swab in the anal swab envelope and the anal swab in the vaginal swab envelope. Misner then looked at the slides that were prepared from the swabs and saw that the vaginal smear slide was "typical of a vaginal smear slide" and the anal slide was "typical of an anal slide." (R. at 4353.) He found no sperm on the anal slide.

Jennie Wood, a DNA analyst, examined a sample of Defendant's blood and made a DNA profile using both the polymerase chain reaction ("PCR") copying process and short tandem repeat ("STR") typing system. Using the PCR process, Wood determined that the sperm found in Eckart's underwear was consistent with Defendant's profile and occurs in approximately 1 in 9 thousand. Using the STR typing system, Wood found that the male fraction found in Eckart's underwear was consistent with Defendant's DNA profile and occurs in 1 in 12 billion.

Dr. Michael Conneally, a Professor of Medical Genetics and Neurology at Indiana University, also compared Defendant's and Eckart's DNA profiles with the vaginal slide. He testified that the male fraction in the slide was a mixture to which Defendant and Eckart could be contributors. He did, however, compute a statistical significance in that the male fraction occurs in 1 in 27 million.

Dr. Conneally then compared the DNA profiles with Eckart's underwear and found that the male fraction occurred in 1 in 9 thousand using PCR testing and 1 in 12 billion using STR typing. Dr. Conneally then compared the DNA profiles with the swabs and found that the male fraction occurred in 1 in 6 using PCR testing and 1 in 304 million using STR typing. After Dr. Conneally removed the common gene found in Eckart's underwear with both STR and PCR testing, he multiplied the remaining genes to get an overall chance of this profile that was consistent with Defendant's profile and found that it occurs in 1 in 4 trillion.

Due to pre-trial publicity, the jury was drawn from a different county. The jury found Defendant guilty of murder,[1] felony murder,[2] rape,[3] class B felony confinement,[4] and class D felony confinement.[5] Pursuant to the Indiana death penalty statute, the jury then reconvened to consider the State's request that Defendant be sentenced to death because of the following aggravating circumstances:

(1) Defendant committed the murder by intentionally killing Kelly Eckart while committing or attempting to commit rape;[6]

(2) Kelly Eckart was the victim of a sex crime under Ind.Code § 35-42-4 (rape) for which Defendant was convicted;[7] and

(3) Kelly Eckart was the victim of criminal confinement under Ind.Code § 35-42-3-3 for which Defendant was convicted.[8]

The jury recommended that Defendant receive a death sentence. The trial court subsequently determined that the State established the charged aggravators beyond a reasonable doubt. After giving

---

**1.** *See* Ind.Code § 35-42-1-1 (1993).

**2.** *See Id.*

**3.** *See* Ind.Code § 35-42-4-1 (1993).

**4.** *See* Ind.Code § 35-42-3-3 (1993).

**5.** *See Id.*

**6.** *See* Ind.Code § 35-50-2-9(b)(1)(F) (1996 Supp.).

**7.** *See* Ind.Code § 35-50-2-9(b)(13)(D) (1996 Supp.).

**8.** *See* Ind.Code § 35-50-2-9(b)(13)(C) (1996 Supp.).

weight only to the first aggravating circumstance listed above, *i.e.*, Defendant's intentional killing while committing rape, the court found that this aggravator outweighed Defendant's mitigating evidence, and determined death to be the appropriate sentence. The trial court then entered judgment on the murder, rape, and Class B confinement counts and sentenced Defendant to death. It imposed consecutive sentences of 20 years each for the rape and criminal confinement convictions.

Additional facts will be discussed as necessary.

### Discussion

Defendant contends that his convictions should be reversed because the trial court improperly permitted certain evidence to be used at trial. We address these claims in parts I and II and IV through VI of this opinion. He also maintains that there was insufficient evidence to sustain the convictions, a claim we address in part III. Finally, we address his claims of sentencing error in parts VII through XII.

### I

As described under *Background, supra*, the State presented DNA evidence that showed that sperm found in Eckart's underwear was consistent with Defendant's profile. This evidence was derived from a process called polymerase chain reaction (PCR) and a newer process called short tandem repeat (STR). Defendant does not contest on appeal the proper admission of the PCR evidence but does argue that the trial court erred by admitting the STR analysis.

The results of DNA testing, like any other evidence aided by expert testimony, must be offered in conformity with the Indiana Rules of Evidence. *Jervis v. State*, 679 N.E.2d 875, 881 (Ind.1997); *Harrison v. State*, 644 N.E.2d 1243, 1251 (Ind.1995). Accordingly, DNA testimony becomes admissible as evidence when the trial court is satisfied that: "(1) the scientific principles upon which the expert testimony rests are reliable; (2) the witness is qualified; and (3) the testimony's probative value is not substantially outweighed by the dangers of unfair prejudice." *Ingram v. State*, 699 N.E.2d 261, 262 (Ind. 1998) (quoting *Harrison*, 644 N.E.2d at 1252). Indiana does not recognize a test or specific set of elements to satisfy reliability of a process under the rules of evidence. *See McGrew v. State*, 682 N.E.2d 1289, 1292 (Ind.1997). We review the trial court's decision to admit the STR test results for an abuse of discretion. *Ingram*, 699 N.E.2d at 262.

Defendant makes no substantial direct attack on the reliability of the scientific principles supporting STR testing per se.[9] He does not argue that either Dr. Conneally or Wood, the State's STR experts, was not qualified to testify as to the test results. Nor does he argue that the evidence was unfairly prejudicial. What he does argue, as best we understand the claim, is this: the only basis that the State arguably gave the court to pass on the scientific reliability of STR testing was the testimony of Wood and Dr. Conneally; Wood was not qualified to testify as to the reliability of the STR process and Dr. Conneally did not; therefore, the court had no basis to find the evidence scientifically reliable.

While the State might have done more to establish the scientific reliability of STR testing (Wood does not seem to

---

**9.** Indeed, Defendant made no request, either before or during trial, for a hearing on the reliability of STR testing.

have been entirely up-to-speed on the scientific principles upon which STR testing is based), we do not think Defendant has established reversible error. First, Defendant at trial made no and on appeal makes only a modest [10] argument that STR testing is unreliable. While the proponent of the evidence bears this burden at trial, we are now reviewing the trial court's decision to admit for abuse of discretion. What we do have here is the testimony of two DNA experts, the qualifications of whom Defendant does not challenge, and our own review of STR technology in a recent case. Wood testified that she held an undergraduate degree in genetics and participated in a year-long internship-training program dealing with DNA analysis with the Indiana State Police. She further testified that she worked for four and a half years as a DNA analyst for the Indiana State Police before she became a serology analyst for the Greenwood Police Department. She then testified that based on her education, experience, and training, as well as her review of relevant scientific literature, STR testing is based on reliable scientific principles.

And although Dr. Conneally described STR testing as "relatively new," he did not question its reliability. He testified that DNA analysts often rely on STR analysis and that it is a generally accepted technique in the scientific community.

In *Troxell v. State*, 778 N.E.2d 811 (Ind. 2002), this court found that STR testing is generally regarded as reliable as both the scientific literature and a multitude of state courts have similarly concluded. *Id.* at 815–16 (citing cases).

Under this combination of circumstances, we conclude that the trial court was within its discretion to admit the STR evidence.

## II

Defendant next contends that the trial court erred in admitting the testimony of Misner, a witness whom Defendant claims "had no expertise or specialized knowledge in the area of his observation." (Br. of Appellant at 23.) The testimony of Misner to which Defendant takes issue was, as discussed under *Background, supra,* that swabs taken of Eckart's vagina were apparently inadvertently placed in an envelope marked "anal" and swabs taken of her anus were placed in an envelope marked "vaginal." [11] Defendant contends that Misner's training in serology (the scientific study of fluid components of the blood) does not qualify him to testify in a matter relating to the identification of various cells, something which Defendant contends is the unique specialty of a cytologist.

There is no hard and fast rule as to the quantum of knowledge required to qualify a witness as an expert in a given field. *Fox v. State,* 506 N.E.2d 1090, 1095 (Ind.1987); *Reid v. State,* 267 Ind. 555, 372 N.E.2d 1149, 1152 (1978). "The witness must be shown to be competent upon the subject concerning which she is to testify. The extent of the witness' knowledge affects the weight of her testimony, not its admissibility." *Burp v. State,* 612 N.E.2d 169, 171 n. 1 (Ind.Ct.App.1993) (citing *Fox,* 506 N.E.2d at 1095). "A witness may be qualified by both training and practical experience." *Id.* (citation omitted).

We disagree with Defendant's proposition that Misner was required to

---

10. Defendant cites only an unpublished California trial court ruling in support of his position. *People v. Bokin,* SCN: 168461 (Cal. Sup.Ct. (San Francisco) May 6, 1999) (Order).

11. The importance of the distinction was that Defendant was charged with rape, a charge for which proof of vaginal intercourse is essential. *See* Ind.Code § 35–42–4–1 (1993).

have had the expertise of a cytologist in order to have the specialized knowledge required to observe that the swabs were incorrectly labeled. The record shows that Misner had substantial experience dealing with matters relevant to his testimony in this case. He earned a B.S. in biology and was a serologist for six years before becoming serologist supervisor. Subsequently, he became a DNA supervisor and later was named the supervisor of the DNA database at the Indiana State Police Laboratory. As part of his training, Misner was taught to look at vaginal swabs and to differentiate between sperm and other types of cells. He also learned to identify and differentiate vaginal cells from other cell types. At trial, Misner testified that he had tested several thousand vaginal smears and every one had vaginal epithelial cells. In light of Misner's experience, training, and education, it was not an abuse of discretion for the trial court to allow his testimony on this matter.

The propriety of the trial court's admission of Misner's testimony is further substantiated by Misner's other observations supporting his opinion. Misner testified that the swab labeled "vaginal" contained fecal-type debris and that the swab labeled "anal" looked "like vaginal swabs." (R. at 4352–54.) Misner tested this observation by comparing the mislabeled swabs with properly labeled anal and vaginal smear slides. Through this comparison he was able to confirm that the swabs had been incorrectly identified. We find Misner's explanation for the discrepancy in labeling highly plausible. *See Jervis,* 679 N.E.2d at 881.

### III

Defendant contends that the evidence presented at trial was insufficient as a matter of law to establish that he committed the crime of rape. This claim is particularly important because the principal aggravating circumstance supporting Defendant's death sentence is that he intentionally killed Eckart while committing or attempting to commit rape. As such, if the rape conviction does not stand, the death sentence itself would be in jeopardy.

■ In reviewing a sufficiency of the evidence claim, the Court neither reweighs the evidence nor assesses the credibility of the witnesses. *See Garland v. State,* 719 N.E.2d 1236, 1238 (Ind.1999), *reh'g denied.* We look to the evidence most favorable to the verdict and draw reasonable inferences therefrom. *See Sanders v. State,* 704 N.E.2d 119, 123 (Ind.1999). A conviction will be upheld if there is substantial evidence of probative value from which a jury could have found the defendant guilty beyond a reasonable doubt. *See Warren v. State,* 725 N.E.2d 828, 834 (Ind.2000).

Defendant's contention that there was not sufficient evidence to establish that he committed rape rests on his claim that "the State relied solely upon the evidence of sperm being found on specimens taken during the autopsy of the victim" to prove Defendant raped Eckart. (Br. of Appellant at 36.) Defendant believes this evidence to be insufficiently "reliable" to support a rape conviction and, by extension, to show that he intentionally committed murder during the commission of a rape. (Br. of Appellant at 38.)

As discussed *supra,* Defendant was convicted of rape, a Class B felony. Indiana Code § 35–42–4–1 (1993) defines the crime as follows:

A person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when:

(1) the other person is compelled by force or imminent threat of force;

(2) the other person is unaware that the sexual intercourse is occurring; or

(3) the other person is so mentally disabled or deficient that consent to sexual intercourse cannot be given;

commits rape, a Class B felony.

■ In this case, three witnesses testified that Defendant's semen was found in Eckart's vaginal region.

Dr. Clark, a forensic pathologist, performed an autopsy on Eckart. As part of the autopsy he examined the genitals of the decedent and took oral, vaginal, and anal swabs for future analysis. He made more than one set of slides from the swabs—giving unlabelled slides he did not intend to keep for himself to evidence technician J.D. Maxwell during the autopsy. Dr. Clark marked the slides he kept for himself with the autopsy number, set them on a cardboard tray meant to hold slides, and placed the tray on a table where he would know where it was after the autopsy. One of the technicians then carried the slides to the cytology lab in the hospital where they were stained and cover slips were affixed. Dr. Clark's secretary retrieved the prepared slides for him to examine. Dr. Clark testified that, upon examination, he "saw sperm in the vaginal smear" indicating that sperm was in the vagina. (R. at 3641.) He found no evidence, however, of sperm in the mouth or anus. From this evidence, the jury could properly infer that Defendant had intercourse with Eckart.

Misner also testified to the presence of Defendant's semen in Eckart's vagina. Defendant's contention that Misner lacked the specialized knowledge or expertise to give this opinion is his sole objection to this testimony. As explained in section II, Misner was qualified to present this testimony.

We also observe that Eckart's car was found abandoned on the side of the road and her body was discovered with a ligature around her neck. An autopsy revealed the ligature to be the result of Eckart's having been strangled to death by a shoelace and the strap from her bib overalls. A circular wound, consistent with a gunshot wound, was also noticed by investigators.

In light of these facts, the jury could properly infer that the State had proved the elements of the crime of rape beyond a reasonable doubt, *i.e.,* that Defendant had vaginal intercourse with Eckart and that Defendant had compelled Eckart to comply by force or imminent threat of force or that she was unaware that the sexual intercourse was occurring.

## IV

Defendant maintains that the trial court should have declared a mistrial when it discovered that the State had failed to disclose to Defendant that Defendant's wife had changed her testimony prior to trial. Instead of declaring a mistrial, the trial court fashioned its own remedy and barred the State from rehabilitating the witness after Defendant impeached her testimony with her prior inconsistent statements.

Prior to trial, Melissa gave a statement to law enforcement on three occasions and testified before a grand jury. She was also deposed once. On each of these occasions, she stated either that she had no knowledge of Defendant's activities on the Monday following the offense or that she had no further information relevant to the investigation at all. The defense was apprised of these statements and testimony.

During trial, however, Melissa testified that on the Monday following the offense, she, Defendant, and their four children took Defendant's van to the car wash but did not wash its exterior. She further testified that Defendant spent close to an hour cleaning the interior of the van from

behind the driver and passenger seats to the bed area in the rear of the van. She also testified that Defendant showed no interest in cleaning the front passenger seats or the floorboard.

In a hearing outside the presence of the jury, it was revealed that Melissa, accompanied by her attorney, had given the prosecution this version of Monday's events prior to trial. The prosecutor told the court that she had said she had not described the Monday happenings in her other statements because Defendant had physically abused her in the past and she feared what he might do to her in the future should he be acquitted knowing she had incriminated him. The State had not notified the defense about this development.

The trial court found the withholding of this information to have been improper. While denying the Defendant's motion for a mistrial, the trial court prohibited the State from offering any evidence to rehabilitate Melissa following defense impeachment of her inconsistent statements to police. This, of course, had the effect of preventing the State from asking about domestic violence as a reason for the inconsistencies.

Defendant's first argument for mistrial is that the State's failure to share Melissa's testimony regarding Monday's events constituted a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. Defendant particularly focuses on *Brady*'s

language that "the suppression by the prosecution of evidence favorable to an accused is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. In *Brady*, the prosecution withheld extra-judicial statements, which, had they been released, would have favored the defendant. It was not until after trial, conviction, and sentencing that the withheld statement was revealed. In contrast, the withheld evidence here was unfavorable to Defendant and was revealed during, not after, trial. *Brady* applies to the discovery of favorable evidence after trial and does not apply here.[12] *See Lowrimore v. State*, 728 N.E.2d 860, 867 (Ind.2000).

Defendant's second argument for a mistrial is that the State's late disclosure of Melissa's statement constituted prosecutorial misconduct. Defendant maintains that his unawareness of Melissa's testimony fatally damaged Defendant's due process right to an adequate cross-examination by limiting his tactical options. He says that he "found himself on the 'path' and was unable to have prepared or proceeded differently" without opening the door to "his prior bad acts." (Reply Br. of Appellant at 18.)

A claim of prosecutorial misconduct requires a determination that there was misconduct by the prosecutor and that it had a probable persuasive effect on the jury's decision. *Lowrimore*,

12. It is true, as Defendant maintains, that evidence that is "impeaching" can constitute "favorable evidence" for *Brady* purposes. *U.S. v. Howell*, 231 F.3d 615, 624 (9th Cir. 2000); *see also U.S. v. Bagley*, 473 U.S. 667, 676–677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). But the challenged testimony of Melissa Overstreet is not "impeaching" evidence in this sense. The "impeaching" evidence prong of *Brady* requires that, if the prosecutor

has undisclosed evidence that would impeach testimony given by a witness in court, the prosecutor is required under *Brady* to disclose it. *See U.S. v. Reyes*, 270 F.3d 1158, 1166 (7th Cir.2001). That is not what happened here. The evidence that would impeach Melissa's testimony given in court (i.e., Melissa's prior deposition testimony, etc.) was known to the defense.

728 N.E.2d at 867; *Cox v. State,* 696 N.E.2d 853, 859 (Ind.1998); *see also* Ind. Professional Conduct Rule 3.8(d) ("The prosecutor in a criminal case shall: make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal"). Absent clear error and resulting prejudice, the trial court's determination of violations and sanctions will be affirmed. *Williams v. State,* 714 N.E.2d 644, 649 (Ind.1999). "A mistrial is 'an extreme remedy granted only when no other method can rectify the situation.'" *Lowrimore,* 728 N.E.2d at 867; *see also Williams,* 714 N.E.2d at 649.

■■■ The parties dispute whether the trial court found the State's belated disclosure of Melissa's impeachment testimony to be misconduct. The trial court made clear that it viewed the failure to disclose as a "serious" implication of due process concerns.

■■■ Although the State should have disclosed the evidence in question, the State's failure to disclose was adequately remedied by the trial court. In making this determination, we note that the trial court spent considerable time and effort in addressing Defendant's legitimate concerns. The trial court's remedy placed the parties in the position they would have been in had the disclosure been properly made.

It is difficult to see how the trial court's remedy had a probable persuasive effect on the jury's decision. Defendant's claim that his ability to cross-examine Melissa was oppressively curtailed is without merit. Defendant was left free to ask the witness a wide range of questions, such as whether she had been truthful in her statements or whether she had violated her immunity agreement by not volunteering more information. Defendant was merely prohibited from asking Melissa why she had not been consistent, which is a question that Defendant specifically told the trial court he would not have asked had the State properly disclosed the inconsistent testimony beforehand. Furthermore, were we to find in Defendant's favor on this issue, the State on retrial would no longer be bound by the order not to reveal Defendant's history of domestic violence and the attendant fear of Melissa. Accordingly, we find that the prosecutorial misconduct here did not require declaring a mistrial in this case.

V

Defendant maintains that the trial court committed reversible error when it admitted Melissa's testimony regarding statements Defendant made to her when they were married.

■■■ Indiana law protects the privacy of marital communications. This court recognizes the "[s]trong public policy grounds [that] favor promotion and preservation of marital confidences even if truthful and invaluable testimony in certain cases is excluded." *Russell v. State,* 743 N.E.2d 269, 272 (Ind.2001) (citations omitted). However, the marital privilege is not absolute. "[W]here a spouse's testimony concerns disclosures by the other spouse not made in reliance upon the marital relationship but because the disclosing spouse was in need of his mate's assistance and attempted to coerce by force and fear, the testimony is not within the spousal privilege and is admissible." *Id.; see also Carlyle v. State,* 428 N.E.2d 10, 12 (Ind.1981). Also not privileged are "[c]ommunications

between spouses intended to be transmitted to a third person." *Russell,* 743 N.E.2d at 272 (citing *Perkins v. State,* 483 N.E.2d 1379, 1383 (Ind.1985)).

Defendant specifically contests the admission of two separate pieces of testimony.[13] First, Melissa testified that when she picked up Defendant at Camp Atterbury, he told her to say that he had been drinking with friends if someone asked why he had been there. Second, Melissa told the jury that, after watching a television news report regarding Eckart in their bedroom, she asked Defendant if he was somehow involved. He became angry at the question and said, "I can't believe that you would think anything like that." (R. at 3878.)

Defendant mistakenly relies on *Hazelwood v. State,* 609 N.E.2d 10 (Ind.Ct.App. 1993), *trans. denied,* to dispute the propriety of admitting both statements. In *Hazelwood,* the defendant's ex-wife testified that, when she was married to the defendant, he faked a burglary of their home in an attempt to make money and, in furtherance of his plan, told her to call the police to report a burglary. *Id.* at 14. Defendant understands *Hazelwood* to stand for the proposition that "communications intended to be conveyed to third parties may still have a privileged character" and that an intent to deceive the police should be considered privileged. (Br. of Appellant at 40 (citing *Hazelwood,* 609 N.E.2d at 15 ("Calling the police to report a burglary seems to be a message intended for the police, but doing so because Hazelwood asked her reveals the underlying reason she acted, which in turn, suggests a confidential communication intended to be transmitted solely between husband and wife.")).) Dicta notwithstanding, the Court of Appeals did not decide whether the testimony fell within marital privilege. Rather, it found that admitting the testimony was not error because any alleged error was "simply cumulative of evidence that was properly admitted." *Hazelwood,* 609 N.E.2d at 15.

▮ In this case, Defendant's statement to Melissa instructing her to say that he had been drinking with friends if someone asked why he had been at Camp Atterbury was not a disclosure made within the confines of the marital relationship. It is a reasonable inference from this statement that Defendant intended Melissa to transmit the comment to a third person. *See Russell,* 743 N.E.2d at 272; *Perkins v. State,* 483 N.E.2d 1379, 1383 (Ind.1985). We do not find error in permitting this testimony.

▮ The State concedes that Melissa's testimony regarding Defendant's denial that he had anything to do with Eckart's disappearance falls within the marital privilege, see Br. of Appellee at 31 ("Melissa's testimony ... appears to fall within the marital privilege."), but contends that the error was harmless. Evidence admitted in error may not require reversal if the error is found to be harmless. *Russell,* 743 N.E.2d at 272; *Ford v. State,* 704 N.E.2d 457, 460 (Ind.1998), *reh'g denied.* Evidence meets this standard if it does not prejudice the defendant's substantial rights. Ind. Trial Rule 61; *Fleener v. State,* 656 N.E.2d 1140, 1141–42 (Ind.1995).

▮ We find the admission of this testimony harmless given that Defendant's statement was not incriminating and that there was very substantial evidence of guilt properly admitted. While we need

---

**13.** Although Melissa testified as to other statements made to her by Defendant, they are not challenged in this appeal.

not recapitulate it in its entirety, we do note the following. Defendant told his brother that he "took a girl" just before being dropped off at Camp Atterbury on the night the crime was committed. (R. at 3226, 3230.) Following Eckart's disappearance, Defendant would sit in front of the television and flip from channel to channel watching news coverage. He stopped watching the news after all of the Eckart stories were over. Additionally, Defendant's sperm was found in the vagina of Eckart. DNA testing done on his semen samples showed an overwhelming likelihood that it was Defendant's semen and no one else's.

## VI

Defendant argues that the trial court committed reversible error when it denied his motion to suppress the use of several pieces of biological evidence, of blankets he owned, of a hand-drawn map of Camp Atterbury, and of carpet from his van as evidence at trial.

### A

Defendant first contends that the trial court erroneously denied his motions to suppress the use of four pieces of biological evidence as evidence at trial. In particular, Defendant objects to the trial court's admission of (1) a blood sample; (2) a saliva sample; (3) a pubic hair standard and combing; and (4) a head hair standard.

Defendant contends that the seizing and examining of the above-mentioned biological evidence infringed his right to be free from unreasonable search and seizure under the Fourth Amendment of the United States Constitution and Article I, Section 11, of the Indiana Constitution. Defendant bases this argument on his contention that the warrant affidavit used to acquire a search warrant "did not contain sufficient facts to establish the requisite probable cause necessary to justify the intrusion into [his] body and seizure of his blood, saliva, and hair." (Br. of Appellant at 42, 43.)

■■■ The federal and state constitutions guarantee that a court will not issue a search warrant without probable cause. U.S. CONST. amend IV; Ind. Const. art. I, § 11. "Probable cause to search premises is established when a sufficient basis of fact exists to permit a reasonably prudent person to believe that a search of those premises will uncover evidence of a crime. The decision to issue the warrant should be based on the facts stated in the affidavit and the rational and reasonable inferences drawn therefrom." *Esquerdo v. State*, 640 N.E.2d 1023, 1029 (Ind.1994) (citations omitted). The duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis" for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238–239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Figert v. State*, 686 N.E.2d 827, 830 (Ind.1997). " '[S]ubstantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination' of probable cause." *Figert*, 686 N.E.2d at 827 (alteration in original) (citing *Houser v. State*, 678 N.E.2d 95, 99 (Ind.1997)).

■■■ In this case, the information included in the warrant affidavit was more than adequate to establish the requisite probable cause necessary to justify the contested search and seizure. The affidavit established that Eckart had been missing since September 27, 1997, after her car had been found abandoned on the side of a road. Three days later, on September 30, 1997, her remains were discovered in a rural area of Brown County, Indiana, insti-

gating a homicide investigation. Semen was present in her vaginal cavity, samples of which were taken for evidence. An autopsy revealed that she had been strangled by ligature and her head bore a firearm type wound. It appeared that a stun device or blank pistol may have been used to shoot her.

On November 6, 1997, Defendant's brother, Scott, told police that shortly after midnight on the night that Eckart disappeared, Defendant telephoned him and asked to be picked up from the Days Inn hotel in Franklin, Indiana. Defendant claimed to have had too much to drink. When Scott arrived at the hotel, Defendant met him in the parking lot and requested that Scott take him and a girl to Edinburgh, Indiana. Scott then got into the driver's seat of Defendant's van where he saw a person, whom he assumed to be the girl, laying in back. As Scott was driving, Defendant, who always carries a gun, said that he intended to take the girl into the woods and get her lost. He then directed Scott to a specific location in Atterbury. At Atterbury, Defendant took something white out of the back of the van. Defendant also instructed Scott to tell Defendant's wife, Melissa, to pick Defendant up at the firing range in two hours. Melissa confirmed that she picked Defendant up at the rifle range after having received a phone call from Scott after midnight on September 27, 1997.

The facts as presented in the warrant affidavit are sufficient to establish probable cause to search and seize the contested items. The trial court did not commit error in denying Defendant's motion to suppress the evidence.

### B

Defendant second contends that the trial court erroneously denied his motions to suppress the use of his blankets as evidence at trial. Defendant argues that the search was invalid because "the warrant did not give a sufficient description of the blankets to be seized to limit the officers to items described by the warrant." (Br. of Appellant at 44–45.) In support of this view, Defendant points out that Detective Ketchum testified that the description he had received of the blankets was "real vague" (R. at 1792) and that, armed with an identical provision in a prior search warrant, police officers seized the wrong blankets.

 Both the United States and Indiana Constitutions proscribe general search warrants. *See* U.S. CONST amend. IV; IND. CONST art. I, § 11. "[A] warrant must describe the place to be searched and the items to be searched for." *Phillips v. State,* 514 N.E.2d 1073, 1075 (Ind.1987); *see also Steele v. United States,* 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925). While the items to be searched for and seized must be described with some specificity, there is no requirement that there be an exact description. *See Phillips,* 514 N.E.2d at 1075 ("the purpose for search warrants in cases involving contraband is not necessarily to seize specified property, but to seize property of a specified character"); *see also Pavey v. State,* 764 N.E.2d 692, 702 (Ind.Ct.App.2002) (upholding validity of seizure of a black leather jacket when the officer had an understanding that the suspect wore "biker type clothing"), *trans. denied,* 774 N.E.2d 516 (Ind. 2002).

 In the present case, Defendant argues for an overly restrictive specificity requirement. The search warrant he contests ordered that "two quilted blankets" be seized from Defendant's home at 190 Jordan Street. (R. at 1712.) By limiting the search to two quilted blankets, the warrant was sufficiently specific as to remove unbridled discretion from law en-

forcement. *See Phillips,* 514 N.E.2d at 1075 ("there is no requirement that there be an exact description."); *cf. Hester v. State,* 551 N.E.2d 1187, 1190 (Ind.Ct.App. 1990) (finding that a search warrant lacks sufficient specificity when it orders a search for "[a]ny and all property which may have been the subject of Theft or Burglary occurring in Union Township . . ." and from five different residences on five different days).

In the alternative, Defendant argues that the Franklin Police Department exceeded the scope of the warrant by seizing three quilted blankets. The State responds that Melissa consented to the seizure of the third blanket. Defendant maintains that Melissa's consent, granted on November 6, 1997, did not extend to November 8, 1997.

■■■■■ The consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person who shares the authority. *Trowbridge v. State,* 717 N.E.2d 138, 144 (Ind.1999). Melissa consented to the seizure of the third blanket. On November 6, 1997, she signed a consent form to have her home searched by Franklin police. The search was effectuated. On November 8, 1997, Melissa went to the Franklin Police Department and told a police officer that during their previous search they had failed to pick up the pepper spray and the blanket Defendant had the morning of the crime. Melissa did not want to sign a permission form but told the police to "come and get them." (R. at 1759, 1779.) When the police were at the house, she identified the blanket for them. This blanket, along with the two authorized by the warrant, were accordingly seized. Melissa informed the police officers that she wanted to consult with an attorney after, or as, she gave them the blanket that she had showed them.

It is certainly true that "there are some cases in which temporal limits on a defendant's consent must be honored because a late search can affect his rights." *Elsten v. State,* 698 N.E.2d 292, 295 (Ind.1998) (citations omitted). We have also found unreasonable searches where the search warrant was stale. *See Ashley v. State,* 251 Ind. 359, 367–68, 241 N.E.2d 264, 269 (1968) (search warrant for small amounts of marihuana becomes stale after eight days because of its transitory nature as a commodity); *cf. Williams v. State,* 426 N.E.2d 662, 667 (Ind.1981) (burned belongings of a victim are not likely to be moved; therefore, an affidavit supporting the warrant was not stale after sixty days). In this case, however, the rights of Defendant did not change between November 6 and November 8. In both cases, the consent was given when Defendant was a suspect. Also, the items sought here were not commodities for sale but items meant to be kept indefinitely. Finally, Melissa renewed her consent on November 8 and did not revoke it.

The search warrant issued on November 8, 1997, ordered that "two quilted blankets" be seized from Defendant's home at 190 Jordan Street. (R. at 1712.) This description provided enough detail to identify the sought after blankets properly. Furthermore, in seizing the third quilted blanket, the police did not exceed the warrant as they were authorized to do so by Melissa. The trial court did not err in refusing Defendant's motion to suppress the blanket as evidence.

C

■■■■ Defendant third contends that the trial court erroneously denied his motions to suppress the use of a hand drawn map of Camp Atterbury as evidence at trial. Defendant argues that there was no consent for the search that revealed the map

and that the warrant authorizing the search was defective for lack of specificity.

As indicated in the two preceding sections, the police searched Defendant's home on November 7 pursuant to search warrant. Melissa had also given written consent for this search on November 6. During the search police found in the living room a hand drawn map of the area where Eckart's body was recovered.

Defendant claims that Melissa's consent was improper because it gave the officers "unfettered discretion." (Br. of Appellant at 46.) This is not correct. To the extent that the contested search was authorized by consent, Melissa could limit or restrict the search as she chose. *See Krise v. State,* 746 N.E.2d 957, 964 (Ind.2001); *see also Walter v. United States,* 447 U.S. 649, 657, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (ruling that consent searches are limited by the terms of authorization).

■ In addition to the validity of Melissa's consent, we find that the hand drawn map was left in plain view. We have held that police do not need a warrant to seize incriminating evidence under the plain view doctrine if: "(1) police have a legal right to be at the place from which the evidence can be plainly viewed; (2) the incriminating character of the evidence is immediately apparent; and (3) police have a lawful right of access to the object itself." *See Houser v. State,* 678 N.E.2d 95, 101 (Ind.1997). All these conditions were met in this case. The police, in the house under a valid warrant and with consent, found a map whose incriminating character was immediately evident in light of the evidence contained in the warrant affidavit, and the police had lawful right of access to the object.

We find that the trial court did not commit error in denying Defendant's motion to suppress the hand drawn map as evidence.

## D

Defendant lastly contends that the trial court erroneously denied his motions to suppress the use of carpet taken from his van as evidence at trial.

Defendant argues that, for essentially the same reasons set forth in the three preceding sections, that consent was not valid. We have already addressed this argument and found against Defendant.

Defendant also argues that the warrant lacked specificity, probable cause, and did not authorize a search of his van.

■ The Franklin police properly searched Defendant's van in accord with the warrant. The warrant sufficiently described Defendant's van. It "authorized and ordered" a diligent search of all "vehicles" at 190 Jordan Drive. Further, it stated that "[a] grey van bearing Indiana license plate 41N4644 is parked in the driveway." (R. at 1687.) Additionally, for the reasons explained above, the warrant affidavit established probable cause to search the van.

We find that the trial court did not commit error in denying Defendant's motion to suppress and allowing carpet from Defendant's van as evidence.

## VII

Defendant's first claim challenging the validity of his sentence is that the trial court committed reversible error by refusing his request to give the jury specific verdict forms. As set forth under *Background, supra,* the State alleged three aggravating circumstances to support its request for the death sentence. Under the terms of our death penalty statute, before a jury can recommend a sentence of death, it must unanimously find that one or more of the charged aggravating circumstances

was proven beyond a reasonable doubt. Ind.Code § 35–50–2–9(k) (1996 Supp.); *Bivins v. State,* 642 N.E.2d 928, 947 (Ind. 1994). At the conclusion of the penalty phase, Defendant asked that the jury be given a specific verdict form on which it would indicate whether it had found that the State had proven beyond a reasonable doubt each of the charged aggravators. The State objected and the trial court sustained the objection.

The trial court was on solid ground at the time of its ruling. *Hildwin v. Florida,* 490 U.S. 638, 640–41, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989) (rejecting argument that the Sixth Amendment requires specific findings by the jury that sufficient aggravating circumstances exist to qualify a defendant for capital punishment); *Wrinkles v. State,* 690 N.E.2d 1156, 1168 (Ind. 1997), *cert. denied,* 525 U.S. 861, 119 S.Ct. 148, 142 L.Ed.2d 121 (1998) ("This Court has rejected the requirement of written findings for juries in capital cases."). Subsequent to its ruling, there has been a great deal of ferment in this regard. First, our death penalty statute was amended to require such special verdict forms. Ind.Code § 35–50–2–9(d), *amended by* P.L. 117–2002, § 2. Second, the United States Supreme Court held in *Ring v. Arizona* that the Arizona capital sentencing scheme violated the Sixth Amendment to the extent that it allowed a "sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." 536 U.S. 584, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002). This was because such a judicial finding violates a defendant's right to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id.* at 2439 (alteration in original) (citing *Apprendi v. New Jersey,* 530 U.S. 466, 477, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)).

Picking up on the *Ring-Apprendi* line of reasoning, Defendant here maintains that assuring a unanimous jury finding on the aggravating circumstance requires the court to use specific verdict forms.

■ We hold that *Ring* and *Apprendi* do not require specific verdict forms in this case. The jury here was instructed that it could only recommend a sentence of death if it unanimously found, "beyond a reasonable doubt, each and every material allegation of at least one aggravating circumstance." (R. 1233, 1235.) With this explicit predicate to the recommendation ultimately made by the jury, we find compliance with *Ring*'s and *Apprendi*'s mandate.

Accordingly, we find that the trial court did not violate the Sixth Amendment by refusing to give the jury specific verdict forms.

## VIII

Defendant's second challenge to the validity of his sentence focuses on what he terms the "duplicative aggravating circumstances" that the State alleged in support of its death penalty request. We set forth these aggravators under *Background:* (1) intentional killing during the commission of a rape and (2) the victim was the victim of a sex crime, here rape.[14] His argument is predicated on the contention that the underlying felony of rape is impermissibly present in both aggravators. This, he contends, violates his constitutional guarantees against cruel and unusual punishment under the federal and state constitutions

---

14. The State also alleged the aggravator set forth in Ind.Code § 35–50–2–9(b)(13)(C), that the victim was the victim of confinement. Defendant makes no objection to the use of this aggravator.

and double jeopardy under the state constitution.

 When aggravating circumstances share an element, we look to the policy or policies supporting each aggravator. *See Stevens v. State*, 691 N.E.2d 412, 434 (Ind. 1997), *cert. denied*, 525 U.S. 1021, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998). When the policy behind each aggravator is different, they are not impermissibly duplicative. *See id.* (upholding use of two aggravators with overlapping elements when the policy behind one aggravator goes to the defendant's character and the other goes to the status of the victim). Furthermore, the fact that our death penalty statute involves the weighing, rather than the counting, of aggravating factors mitigates against the concern that overlapping elements in distinct aggravators will get too much consideration. *See id.*

 In the present matter, the felony-murder aggravator addresses Defendant's character. *See id.* (finding that the felony-murder aggravator focuses on the defendant's character, finding highly culpable "the fact that the mind of the accused has in the same criminal episode formulated and held the intent to kill and the intent to commit one of the enumerated felonies"). The victim of a sex crime aggravator spotlights the policy of adjusting punishment in accord with the nature and degree of suffering experienced by the victim. The different policy considerations make the aggravators distinct. The trial court informed the jury that the penalty phase involved weighing, not counting, aggravating factors. And in determining the proper sentence to apply, the judge applied no weight to the victim-of-rape aggravator.

In so doing, the judge accommodated Defendant's claim.

The trial court did not commit error by allowing the jury to consider both aggravating circumstances in this case.

## IX

Defendant next maintains that the Cruel and Unusual Punishment Clauses of the U.S. and Indiana Constitutions [15] require that an instruction on residual doubt be given in capital cases. Accordingly, he claims that the trial court violated his rights under the state and federal constitutions when it did not give a penalty phase instruction he requested advising the jury that it could take any "lingering doubt" that it had about his guilt into account in determining his sentence.[16] (Br. of Appellant at 58.) Defendant points to social science research published in recent years in the area of capital juries that, he claims, shows that "lingering doubt is the strongest influence in support of a final life punishment vote." (Br. of Appellant at 60 (citing William J. Bowers, Marla Sandys & Benjamin D. Steiner: *Symposium: Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-trial Experience, and Premature Decision Making*, 83 Cornell L.Rev. 1476, 1536 (1998)).) Defendant, therefore, maintains that a jury instruction on this matter ensures that the jury's recommendation is a "reasoned moral response." (Br. of Appellant at 60.)

 *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), seems to us to control here. In that case, the Court rejected a claim in a capital case that the defendant was enti-

---

15. Defendant offers no separate Indiana constitutional analysis.

16. Defendant's proffered instruction reads: "The adjudication of guilt is not infallible and any lingering doubts entertained on the question of guilt may be considered in determining the penalty." (R. at 1213.)

tled to a residual doubt instruction. While the Court stopped short of saying that it would never find a capital defendant entitled to make a "residual doubt" claim to a jury during a penalty phase, it did say, in language highly relevant to this case:

> Most importantly, even if we were inclined to discern such a right in the Eighth Amendment, we would not find any violation of it *in this case*. For even if such a right existed, nothing done by the trial court impaired petitioner's exercise of this "right." The trial court placed no limitation whatsoever on petitioner's opportunity to press the "residual doubts" question with the sentencing jury. Moreover, in our view, the trial court's rejection of petitioner's proffered jury instructions was without impact on the jury's consideration of the "residual doubts" issue. We reject petitioner's complaint that the possibility of residual doubt was not "self-evidently relevant to either of the special issue questions," and that "[u]nless told that *residual* doubt ... could be considered in relation to [the special issue] question[s], the jurors could logically have concluded that such doubt was irrelevant." Among other problems with this argument is the simple fact that petitioner's requested instructions on mitigating evidence themselves offered *no* specific direction to the jury concerning the potential consideration of "residual doubt." The proposed instructions did not suggest that lingering doubts about the petitioner's guilt were to be a subject of deliberations in the sentencing phase. Consequently, it is difficult to see how the rejection of these instructions denied petitioner the benefit of any "residual doubts" about his guilt.

*Id.* at 174–75, 108 S.Ct. 2320 (alterations and emphasis in original) (citations omitted). The exact same thing could be said about this case. There was nothing the trial court did here to impair Defendant's ability to argue residual doubt to the jury; and nothing in Defendant's penalty phase argument that directed it to consider residual doubt.

We note that in several cases, we have held that a defendant in a capital case was not the victim of ineffective assistance of counsel where his lawyer did not argue "residual doubt" to the jury. This was because "counsel ought have no obligation to argue to the jury that its just-returned unanimous determination of guilt ought to be revisited." *Miller v. State*, 702 N.E.2d 1053, 1069 (Ind.1998), *cert. denied*, 528 U.S. 1083, 120 S.Ct. 806, 145 L.Ed.2d 679 (2000). For similar reasons, we think a capital defendant has no constitutional entitlement to a residual doubt instruction.

## X

Defendant claims that the trial court erred when it refused to give his tendered penalty phase instruction number 12. In relevant portion, it stated:

> However, before you may make a decision that either death or life without parole is an appropriate sentence, all of you must reach a unanimous decision that the State has proven beyond a reasonable doubt the existence of at least one aggravating factor. You must also reach a unanimous decision that such aggravating factor outweighs any mitigating factors that any one or more of you may have found to exist.

(R. at 1217.)

 The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. Instruction of the jury is generally within the discretion of the trial court and is reviewed only for an abuse of

that discretion. *Lowery v. State*, 547 N.E.2d 1046, 1055 (Ind.1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176 (1990). A trial court erroneously refuses to give a tendered instruction, or part of a tendered instruction, if: (1) the instruction correctly sets out the law; (2) evidence supports the giving of the instruction; and (3) the substance of the tendered instruction is not covered by the other instructions given. *Dye v. State*, 717 N.E.2d 5, 20 (Ind.1999), *cert. denied*, 531 U.S. 957, 121 S.Ct. 379, 148 L.Ed.2d 292 (2000); *Holmes v. State*, 671 N.E.2d 841, 852 (Ind.1996), *cert. denied*, 522 U.S. 849, 118 S.Ct. 137, 139 L.Ed.2d 85 (1997).

The trial court refused to give Defendant's tendered instruction on the grounds that its substance was covered by other instructions already to be given. Defendant claims that the trial court was mistaken in its determination because "no other instruction informed the jury that it must determine unanimously that aggravating circumstances outweigh mitigating circumstances." (Br. of Appellant at 69.) In what largely amounts to a reprise of his argument regarding specific jury verdict forms, *supra*, Defendant argues that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), requires a sentencing jury in a capital case to find each and every essential element beyond a reasonable doubt. (Br. of Appellant at 71 n. 27.)

As we have already explained, the jury was instructed consistent with *Apprendi* and *Ring*. We agree with the trial court that the jury was adequately instructed on the matters raised by Defendant's tendered instruction here:

The law requires that *all jurors* agree to the existence of at least one (1) of the charged aggravating circumstances before any recommendation on death or life imprisonment may be made to the Court.

With respect to mitigating circumstances, your findings need not be unanimous. Each juror must weigh in the balance any mitigating circumstance he or she thinks have been established by the evidence, whether or not other jurors are likewise convinced of those mitigating circumstances.

(R. at 1235.) (emphasis added).

We find that the trial court properly rejected Defendant's proposed penalty phase instruction number 12.

## XI

Defendant claims that his sentence in this case violates the Double Jeopardy Clause of the Indiana Constitution in two respects. *See* Ind. Const. art. I, § 14 ("No person shall be put in jeopardy twice for the same offense.") Neither claim requires extended treatment.

The application of the Indiana Double Jeopardy Clause is distinct from its federal counterpart. *See Richardson v. State*, 717 N.E.2d 32, 49 (Ind.1999). It "prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Id.*

Defendant expresses his first argument as follows: "Because the statutory elements necessary to establish that [he] raped Eckart were necessary to establish the aggravating circumstance upon which the death sentence rests, sentences for both Rape and Capital Murder violate the State double jeopardy prohibitions." (Br. of Appellant at 83.) He asks that the 20 year sentence imposed for rape be vacated. It is true that the "aggravating circumstance" set forth in Ind.Code § 35–50–2–9(b)(1)(F) (intentional killing while committing rape) used to support the death sentence here required that the

State prove that Defendant committed rape. But we have held that facts necessary to establish the (b)(1) aggravating circumstance serve to narrow the eligibility for the penalty and are not identical to the elements of the crime. *West v. State,* 755 N.E.2d 173, 186 (Ind.2001). We hold that it did not violate the Double Jeopardy Clause of the Indiana Constitution for the trial court to enter sentence on the rape conviction even if it also entered sentence on the felony-murder conviction.[17]

Defendant also argues that his Class B felony criminal confinement conviction should be reduced to a class D felony confinement on the ground that there is a reasonable probability that the jury utilized the same facts to find the serious bodily elements of the class D confinement and the injury that caused Eckart's death. The State concedes this argument, noting that "the prosecutor argued that the serious bodily injury had been established by Eckart's death." (Br. of Appellee at 59.) Accordingly, we reduce Defendant's class B felony criminal confinement conviction to a class D felony.

## XII

■ We now review whether Defendant's death sentence is appropriate. The Indiana Constitution provides, in part, that "[t]he Supreme Court shall have, in all appeals of criminal cases, the power to review and revise the sentence imposed." Ind. Const. art. VII, § 4. Although our rules for appellate review of sentences require that deference be given to the judgment of the trial court where the sentence is death, those rules "stand more as guideposts for our appellate review than as immovable pillars supporting a sentence decision." *Spranger v. State,* 498 N.E.2d 931, 947 n. 2 (Ind.1986), *reh'g denied,* 500 N.E.2d 1170 (Ind.1986), *cert. denied,* 481

U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987). Moreover, "this Court's review of capital cases under article 7 is part and parcel of the sentencing process." *Cooper v. State,* 540 N.E.2d 1216, 1218 (Ind.1989).

■ This special review of death sentences is grounded in the Indiana Constitution, our state's death penalty statute, and federal death penalty jurisprudence. *Harrison v. State,* 644 N.E.2d 1243, 1260 (Ind.1995), *after remand,* 659 N.E.2d 480 (Ind.1995), *cert. denied,* 519 U.S. 933, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). The United States Supreme Court "has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.'" *Caldwell v. Mississippi,* 472 U.S. 320, 329, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (quoting *California v. Ramos,* 463 U.S. 992, 998–99, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)). Meaningful appellate review of death sentences plays a crucial role in ensuring that the death penalty is not imposed arbitrarily or irrationally. *Parker v. Dugger,* 498 U.S. 308, 321, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991).

Our death penalty statute guides our review of death sentences by providing standards for governing the trial court's imposition of death sentences. Following the completion of the guilt-determination phase of the trial and the rendering of the jury's verdict, the trial court reconvenes for the penalty phase. Before a death sentence can be imposed, our death penalty statute requires the State to prove beyond a reasonable doubt at least one aggravating circumstance listed in subsections (b)(1) through (b)(16) of the

---

**17.** As such, we answer the question left open in *West,* 755 N.E.2d at 186 n. 6.

statute.[18] *See* Ind.Code § 35–50–2–9 (1998). As discussed at several points in this opinion, the State supported its request for the death penalty with the following aggravating circumstances: (1) that Defendant committed the murder by intentionally killing the victim while committing or attempting to commit rape, see *id.* § 35–50–2–9(b)(1)(F) (Supp.1996); (2) that the victim was a victim of a sex crime under Ind.Code § 35–42–4, here rape, for which Defendant was convicted, see *id.* § 35–50–2–9(b)(13)(D); and (3) that the victim was a victim of criminal confinement (Ind.Code § 35–42–3–3) for which Defendant was convicted, see *id.* § 35–50–2–9(b)(13)(C).

The death penalty statute requires that any mitigating circumstances be weighed against any properly proven aggravating circumstances. As mitigating circumstances, Defendant offered the following: (1) residual doubt as to Defendant's guilt; (2) that the Defendant was under the influence of extreme mental or emotional disturbance because of a past history of mental health problems as well as his mental condition at or about the time of the crimes at issue here; (3) that Defendant's capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of the law was substantially impaired, again because of his mental health history and mental condition at the time; (4) that Defendant suffered from a deprived and abusive developmental history; (5) that Defendant had no significant history of prior criminal conduct; (6) that a sentence of death would result in an undue hardship to the Defendant's children and loved ones; (7) Defendant's good conduct while incarcerated; and (8) that the State had the necessary and appropriate prison facilities and staff to provide secure incarceration for Defendant.

The jury recommended that a sentence of death be imposed.

Once the jury has made its recommendation, the jury is dismissed, and the trial court has the duty of making the final sentencing determination at the sentencing hearing. At that proceeding, the trial court sustained Defendant's objection to victim impact evidence being presented. The trial court reasoned that a death sentence "must be based exclusively upon statutorily enumerated capital sentencing aggravating circumstances," and the victim impact evidence here would not be relevant to any of the alleged aggravating circumstances. (R. 5382.) Defendant also presented additional evidence in support of the mitigating circumstances argued to the jury.

Applicable law imposes several requirements on the trial court in making its sentencing determination. First, the trial court must find that the State has proven beyond a reasonable doubt that at least one of the aggravating circumstances listed in the death penalty statute exists. *See* Ind.Code § 35–50–2–9(k)(1) (Supp.1996). Second, the trial court must find that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. *See id.* § 35–50–2–9(k)(2). Third, before making the final determination of the sentence, the trial court must consider the jury's recommendation. *See id.* § 35–50–2–9(e). The trial court must make a record of its reasons for selecting the sentence that it imposes.

**18.** We note that at the time the murders occurred, the effective statutory aggravators upon which Defendant could have been sentenced to death or life imprisonment without parole were listed in subsections (b)(1) through (b)(15). *See* Ind.Code § 35–50–2–9 (Supp.1996). The legislature has since then promulgated one more statutory aggravator under subsection (b). *See* P.L. 261–1997 § 7.

*See id.* § 35–38–1–3. We commend Judge Emkes for a particularly thoughtful and thorough sentencing order.[19]

▮ In imposing the death sentence in the instant case, the trial court found that the State proved beyond a reasonable doubt the three charged aggravating circumstances, each of which is listed in the death penalty statute. The record and the law support this finding. However, the trial court assigned weight only to the (b)(1)(F) (intentional murder while committing rape) aggravating circumstance, finding the facts supporting the other two circumstances to overlap those in the first and that assigning weight to them would duplicate the weight given the first. We concur with this approach. The trial court did assign the (b)(1)(F) aggravator "substantial weight and great consideration." (R. 1294.)

The trial court provided a particularly careful and detailed analysis of Defendant's proposed mitigating circumstances. The court gave careful attention to Defendant's claim that residual doubt about his guilt should be considered a mitigating circumstance but found little weight should be given. After a lengthy discussion of the psychological and psychiatric evidence, the trial court found that Defendant was under the influence of extreme mental or emotional disturbance at the time of the crimes and assigned that mitigator moderate weight. It found some evidence that Defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired by mental disease, defect or intoxication but that there was also extensive evidence that Defendant

was in control of his conduct and aware of its criminality. As such, the trial court assigned this mitigator low to moderate weight.

The trial court recognized Defendant's deprived and abusive developmental history as a mitigating circumstance and assigned it low weight. It also recognized that Defendant had no significant history of prior criminal conduct, including no felony convictions. The trial court assigned this circumstance moderate to heavy weight. As to Defendant's claims that hardship to his family, his good behavior in prison, and the ability of the State to provide secure incarceration should be considered mitigating circumstances, the trial court agreed but assigned them only minimal weight.

In accordance with our death penalty statute, the trial court next balanced the weight it assigned to the (b)(1)(F) aggravating circumstance with the weight it assigned the mitigating circumstances. It found the aggravating circumstance outweighed the mitigating circumstances and that in its analysis, death was the appropriate sentence for Defendant for this crime.

In this appeal, Defendant primarily contends that the weight of the aggravating circumstances do not outweigh mitigating circumstances attributable to his past history of mental health problems, his upbringing in and abusive and dysfunctional family environment, and his mental condition at or about the time of the crimes at issue.[20] After independent review of the aggravating and mitigating circumstances here, we assess the weight attributable to the aggravating and mitigating circum-

---

**19.** Indiana lawyers and judges in proceedings under Ind.Code § 35–50–2–9 will find the sentencing order issued in this case a highly instructive reference.

**20.** Defendant registers two additional brief challenges to the trial court's sentencing order.

First, he claims that the trial court's sentencing order failed to note what consideration, if any, it gave to the jury's recom-

stances in the same manner as the trial court.[21]

Based on our review of the record and the law, we agree with the trial court's conclusion that the State proved beyond a reasonable doubt the (b)(1)(F), (b)(13)(D), and (b)(13)(C) aggravating circumstances promulgated in the death penalty statute. We agree with the trial court that the (b)(1)(F) aggravating circumstance alone outweighs the mitigating circumstances.[22] We conclude that the death penalty is appropriate for Defendant's murder of Kelly Eckart.

## Conclusion

We affirm Defendant's convictions for murder, rape, and criminal confinement and his sentence of death and sentence of 20 years for rape. We vacate his sentence of 20 years for criminal confinement as a Class B felony and remand this matter to the trial court for resentencing as a Class D felony.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.

---

mendation. It is true that the trial court's sentencing order only mentions the jury's recommendation briefly. But unlike those cases where an indication of the extent to which the trial court took the jury's recommendation into account has been of particular importance to us in our review (including the case Defendant cites as authority here, *Roark v. State*, 644 N.E.2d 565 (Ind. 1994)), here the jury unanimously recommended that death be imposed. We find Defendant suffered no detriment from any failure of the trial court to give greater weight than it did to the jury's recommendation that he be sentenced to death.

Second, Defendant complains that the trial court only considered one of the three charged aggravating circumstances. As discussed in part VIII, *supra,* the trial court found that the State had properly proved the aggravating circumstances of victim of a rape and of a criminal confinement for which Defendant had been convicted but that it was not going to assign weight to either of those aggravators. We find Defendant suffered no detriment from any failure of the trial court to give weight to two additional properly proven aggravating circumstances. Indeed, as we found in part VIII, *supra,* this was effectively what Defendant sought.

21. The trial court's careful and comprehensive sentencing statement in this case causes us to reflect on how far we have come since 1985 when Justice DeBruler was moved to write:

> There is a nagging doubt, arising from this court's frequent confrontation in reviewing death sentences with the finding of absolutely no mitigating circumstances, that the mitigating circumstance search required by the death statute is either being misunderstood, misapplied, or not reflected in sentencing court findings. In my opinion it needs to be reiterated and emphasized for the guidance of judges and lawyers that a finding of the existence of a mitigating circumstance does not preclude a positive death decision.

*Wallace v. State,* 486 N.E.2d 445, 465 (Ind. 1985) (DeBruler, J., concurring in result and dissenting), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 723 (1986). In this case, the trial court's careful analysis identifies the presence of a number of mitigating circumstances, some of considerable weight, but nevertheless finds them outweighed by the aggravating circumstance. It is clear that the Judge Emkes understood, applied, and reflected the requirements of the statute in her sentencing order and we commend her for it.

22. No issue is raised in this case as to whether an aggravating circumstance under Ind. Code § 35–50–2–9(b)(13) standing alone could be sufficient to support a sentence of death. *Cf. Harrison,* 659 N.E.2d at 483 n. 7; *Id.* at 483–84 (DeBruler, J., dissenting).