**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**THOMAS W. VANES**
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana



FILED
Apr 26 2012, 9:12 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| FREDDIE HOLMAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1108-CR-378 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Thomas P. Stefaniak, Jr., Judge
Cause No. 45G04-1009-MR-12

**April 26, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Freddie Holman appeals his conviction of Reckless Homicide,[1] a class C felony, and the determination that he is a habitual offender.[2] Holman presents the following restated issue for review: Did the trial court commit reversible error in failing to instruct the jury that it may disbelieve the entire testimony of a witness on the basis that the witness had previously lied or given statements inconsistent with her trial testimony?

We affirm.

The facts favorable to the conviction involve the following principals: Holman; Holman's girlfriend, Shanika; Holman's friend, Antoine Young (called Twon); Twon's girlfriend, Lakeitha Young; Lucious Simmons (called Duke), a man with whom Twon had an ongoing dispute; and Duke's girlfriend and the victim in this case, Karen Robinson. Duke and Twon's bad relationship stemmed from an arrangement in March or April of 2007 whereby Duke agreed to replace the water pump on Twon's truck. Duke did not complete the work and was paid only a part of the agreed-upon fee. In early May of 2007, Twon said to Duke, "do it now or I will bust a cap in your butt." *Transcript* at 154. In the early morning hours of May 5, 2007, Twon and Lakeitha arrived in Gary, Indiana, having driven from Chicago. Along the way they shared drugs and alcohol. Meanwhile, Duke had been staying at Robinson's house with members of Robinson's family. At approximately 2:00 a.m., they ran out of liquor so Duke drove to a nearby liquor store to buy more. Duke was stopped at a stoplight when Twon and Lakeitha pulled up beside him. Duke and Twon

---

[1] Ind. Code Ann. § 35-42-1-5(c) (West, Westlaw through end of 2011 1st Regular Sess.).
[2] Ind. Code Ann. § 35-50-2-8 (West, Westlaw through end of 2011 1st Regular Sess.).

exchanged heated words before Duke pulled away. Twon followed him to Robinson's house.

Duke pulled to the curb in front of Robinson's house and stopped. Twon pulled to a stop behind Duke. Twon then got out of his vehicle and sat down on the hood of his car. Twon slid off the hood of his car with a gun in his hand and approached Duke, who exited his vehicle and said, "don't walk up on me." *Id.* at 160. A physical altercation ensued, during which Duke stabbed Twon. After the struggle was over, Duke told Lakeitha to take Twon to a hospital and then walked into Robinson's house. Lakeitha and Twon left a few minutes later. Upon entering Robinson's house, Duke told Robinson that he had been in an altercation and, apparently fearing further trouble, recommended that they all should leave the house and go elsewhere. Everyone left but Robinson, Tina Ballard, who was Robinson's daughter, and Ballard's twelve-year-old daughter. Duke left as well.

Following the altercation, at Twon's direction, Lakeitha and Twon drove to Holman's house, where they picked up Holman and his girlfriend. They proceeded to the hospital, where Twon checked into the emergency room. After that, Lakeitha went back out to Holman and Shanika and told them what had happened. She then asked Holman to drive her back to the hotel where she and Twon were staying. As they drove, Holman asked Lakeitha to direct him to the house where the stabbing had occurred, which was near the hotel. She complied. Holman drove to the house and parked. Lakeitha got out of the car to look for drugs she thought Twon had lost during his altercation with Duke. She saw Holman get out of the car and walk up to the front door of Robinson's house. She got back into the car when she heard a "bang." *Id.* at 214. In all, Lakeitha heard three or four gunshots. She looked up and saw Holman standing near the front door with his arm straightened, pointing a gun at

3

Robinson's front door. Holman returned to the car and they drove back to Holman's house. Once there, Lakeitha asked Holman what he had done. He responded, "whoever was in there, deader than a door knob." *Id*. at 216. Lakeitha understood that to mean "[t]hat somebody was dead." *Id*.

Meanwhile, in Robinson's house, Ballard and her daughter were sleeping on a couch when Ballard heard gunfire. She awakened and looked toward the front door, where she saw her mother fall to the floor between the living room and the front door. Fearing for her safety and the safety of her daughter, Ballard fled to another part of the house for several minutes. When she came back into the living room, she saw that her mother was still lying in the same place as before. She called 911 and when emergency personnel arrived, they found Robinson lying dead on the floor, with gunshot wounds in her chest. These were later determined to be the cause of death.

After Holman and Lakeitha arrived back at his house, they ingested cocaine. He took off his own clothes and burned them, and gave Lakeitha a change of clothes. The two then drove to the hospital so Lakeitha could visit Twon. As he dropped off Lakeitha, Holman said, "Tell "bro" I took care of that for him." *Id*. at 318.

Because it is germane to the issue Holman appeals, we now consider in more detail statements Lakeitha made following the shooting death of Robinson. The investigation in this case lasted almost three years and was spearheaded at different times by two separate officers, Detectives Jack Arnold and Keith Richardson. Lakeitha gave a total of three statements to police during the summer of 2007 following the shooting. She gave a fourth statement in 2010. On February 28, 2011, the State offered Lakeitha use-immunity for her

4

testimony about what occurred on the night Robinson was shot. As a result of this, Lakeitha gave a fifth statement about the incident.

Lakeitha admitted at trial that the earlier statements were inconsistent in some respects with her fifth statement, which was the version of events that the State relied upon to prosecute Holman for Robinson's shooting death. She acknowledged that she "was holding things back" in the earlier statements, *id.* at 237, and that she "was not being all the way honest, because [she] knew what happens to people when they tell police things." *Id.* at 285.

A lengthy investigation resulted in the filing of various charges against Twon, Shanika, and Lakeitha. On September 24, 2010, the State charged Holman with Robinson's murder. He was also alleged to be a habitual offender. Following a jury trial, Holman was convicted of the lesser included offense of reckless homicide and found to be a habitual offender.

At trial, in view of the critical importance of Lakeitha's testimony and the fact that she had admittedly given conflicting accounts of the incident in various statements to police, Holman proposed that the following instruction, Defendant's Proposed Instruction No. 1 (Instruction No. 1), be read to the jury:

> If the jury believes from the evidence in the case that any witness has willfully and knowingly sworn falsely to any material fact in the case or at some other time and place made statements inconsistent with his or her testimony, then you will have the right to disregard the entire testimony of such witness, except in such matters, if any, where his or her testimony is corroborated by other credible evidence or facts and circumstances appearing in the evidence in this case.

*Appellant's Appendix* at 110. Holman contends the trial court committed reversible error in refusing to read this instruction to the jury.

5

"The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Overstreet v. State,* 783 N.E.2d 1140, 1163 (Ind. 2003), *cert. denied,* 540 U.S. 1150 (2004). Instruction of the jury is generally committed to the trial court's discretion and is reviewed only for an abuse of that discretion. *Overstreet v. State,* 783 N.E.2d 1140. When reviewing the refusal to give a proposed instruction, we consider whether: (1) the proposed instruction correctly states the law; (2) the evidence supported giving the instruction; and (3) other instructions already given covered the substance of the proposed instruction. *Driver v. State,* 760 N.E.2d 611 (Ind. 2002). To constitute an abuse of discretion, the instruction given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury.

In *Chambers v. State*, 734 N.E.2d 578 (Ind. 2000), our Supreme Court addressed a challenge to a trial court's failure to give a substantially similar instruction to Instruction No. 1. In *Chambers*, the instruction in question read as follows:

> If you should believe from the testimony in this case that any witness or witnesses have willfully and intentionally testified falsely to any material fact in the case, intending by such false testimony to mislead and deceive you as to the truth in this case, you may under such belief, disregard the whole or any part of the testimony of such witness or witnesses, if in your opinion, you are justified, under your belief, in so doing.

Id. at 580. The trial court declined to read the instruction upon its conclusion that, although a correct statement of the law at one time, the court was concerned that it was "no longer valid after [the Supreme] Court's 1991 decision to overrule the so-called "*Patterson* Rule," which permitted the use of prior statements as substantive evidence." *Id*. at 580 (citing *Patterson v.*

6

*State,* 263 Ind. 55, 324 N.E.2d 482 (1975), *overruled by Modesitt v. State,* 578 N.E.2d 649 (Ind. 1991)).  In *Chambers*, however, the Supreme Court clarified that *Modesitt* "did not affect the right of a jury to disregard the uncorroborated testimony of a witness impeached by prior inconsistent statements and had no impact on the validity of [this] proposed jury instruction." *Chambers v. State*, 734 N.E.2d at 580.  Following this determination, the Court proceeded to consider whether the failure to give the instruction constituted an abuse of discretion.

As noted above, a refusal to give an instruction is not an abuse of discretion if (1) the proposed instruction correctly states the law; (2) the evidence supported giving the instruction; and (3) other instructions already given covered the substance of the proposed instruction. *See Driver v. State,* 760 N.E.2d 611.  With respect to the first element, the Court stated, "[w]hether [it] is desirable or not, it is a correct statement of the law." *Chambers v. State*, 734 N.E.2d at 580.  Regarding the second element, because of the multiple inconsistent statements given by Lakeitha before trial, the giving of Instruction No. 1 was clearly supported by the evidence.  Therefore, as was the case in *Chambers*, the issue in this case turns upon the third element, i.e., whether the substance of Instruction No. 1 "was covered by other instructions that were given and whether the instructions as a whole were adequate." *See id*. at 581.

This inquiry in *Chambers* boiled down to the question of whether the following preliminary and final instruction adequately advised the jury with respect to the credibility of witnesses:

You are the exclusive judges of the evidence, the credibility of the witnesses,

7

and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe; the manner and conduct of the witness while testifying; any interest, bias, or prejudice the witness may have; any relationship with the other witnesses or interested parties; and the reasonableness of the testimony of the witness considered in the light of all the evidence in this case.

You should attempt to fit the evidence to the presumption that the Defendant is innocent and the theory that every witness is telling the truth. You should not disregard the testimony of any witness without a reason and without careful consideration. If you find conflicting testimony, you must determine which of the witnesses you will believe and which of them you will disbelieve.

In weighing the testimony to determine what or whom you will believe, you should use your own knowledge, experience and common sense gained from day to day living. The number of witnesses who testify to a particular fact, or the quantity of evidence on a particular point, need not control your determination of the truth. You should give the greatest weight to that evidence which convinces you most strongly of its truthfulness.

*Id*. Chambers argued that the foregoing instruction did not sufficiently inform the jury "that it had the expansive right to disregard the uncorroborated testimony of a witness who had been impeached by prior inconsistent statements." *Id*. The Supreme Court rejected this argument, concluding that the foregoing instruction "told the jury that it was the exclusive judge of witness credibility, and could disregard the testimony of a witness if it had reason to do so." *Id*. Although the instruction read to the jury was not as pointed on that issue as the rejected instruction, the Supreme Court stated that it was "sufficient discussion of the subject." *Id*. The Court explained: "It is certainly within the jury's 'knowledge, experience, and common sense' to choose to believe or disbelieve a witness who gave inconsistent statements and who may have therefore testified untruthfully. Common experience, shared by us all, includes listening to a stranger and concluding that nothing he or she has to say is believable." *Id*. (internal quotation unattributed). Importantly, the Court also concluded that

8

it was an appropriate exercise of discretion to "refus[e] to dwell on the point raised by the proposed instruction." *Id.*

Like the *Chambers* court in that case, we must examine the instructions that were read to the jury in the present case to determine whether they informed the jury that it could expansively disregard the uncorroborated testimony of a witness who had been impeached by prior inconsistent statements. The State contends that Instruction No. 12 so informed the jury. Instruction No. 12 provided as follows:

> You, the jury, are the sole judges of the credibility of the witnesses and of the weight to be given to their testimony. You should attempt to fit the evidence to the presumption that the defendant is innocent and the theory that every witness is telling the truth, if you can reasonably do so. You should not disregard the testimony of any witness without a reason and without careful consideration. If, however, you find a conflict in the testimony that you cannot reconcile, you may choose whom you will believe and whom you will not believe.
>
> In determining the credibility and the weight you will give to the testimony of each witness, you may rely upon your own knowledge, experience, and common sense gained from day to day living. You may take into consideration their conduct and demeanor while testifying; their interest, if any, or want of interest in the result of the trial; their motive, if any, in testifying; their relation to or feeling for or against the defendant, the alleged victim or the State of Indiana; the probability or improbability of their statements; their opportunity to observe and know of the matters of which they testify; and any factors in evidence which in your judgment may affect their testimony.
>
> You may find that the number of witnesses who testify to a particular fact for one side or the other or the quantity of evidence on a particular point does not control your determination of the truth. You should give the greater weight to that evidence which you believe to be the most truthful and accurate.

*Appellant's Appendix* at 102. Our analysis on this question is as straightforward as this: is Instruction No. 12 sufficiently similar to the instruction read in *Chambers* as to render the

conclusions in that case applicable to this? Holman's arguments to the contrary notwithstanding, we conclude that it is.

In explaining this conclusion, we need not undertake a line-by-line textual comparison of the language of both instructions. It suffices to say that both convey the same relevant information to the jurors. Both inform jurors that the jury is exclusively charged with the task of judging witness credibility and assigning weight to testimony. Both inform jurors that in making such assessments they should take into account the witness's ability to observe. Both inform jurors that they should consider a witness's particular motivations to tell the truth or to lie, and that they should measure the truthfulness of any witness's testimony against the context of the evidence as a whole. Both instruct jurors to consider the witness's manner and conduct while testifying to help gauge the witness's veracity. Finally, and importantly, both convey by strong inference that jurors may entirely reject the testimony of a witness after taking into consideration the factors set out above. In the end, we echo the conclusion of our Supreme Court in *Chambers* that "[t]he trial court did not abuse its discretion by refusing to dwell on the point raised by the proposed instruction." *Chambers v. State*, 734 N.E.2d at 581.

Judgment affirmed.

MAY, J., and BARNES, J., concur.