## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 15 2015, 8:21 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Hilary Bowe Ricks<br>Indianapolis, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | Cynthia L. Ploughe<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Bobby Lee Dean,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | September 15, 2015<br><br>Court of Appeals Case No. 48A02-1409-CR-669<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable David A. Happe, Judge<br><br>Trial Court Cause No. 48C04-0807-FA-401 |

**Brown, Judge.**

[1] Bobby Lee Dean appeals his convictions for dealing in cocaine as a class A felony, maintaining a common nuisance as a class D felony, and resisting law enforcement as a class A misdemeanor. Dean raises five issues which we consolidate and restate as:

    I.    Whether the court abused its discretion in admitting certain evidence;

    II.    Whether the court's final instruction resulted in fundamental error; and

    III.    Whether the prosecutor committed misconduct during closing argument which resulted in fundamental error.

We affirm.

### Facts and Procedural History

[2] On June 15, 2008, Anderson Police Detective Kevin Earley, a member of the Madison County Drug Task Force, received a phone call on his cell phone at home from an individual telling him that Dean and Anwar Hopgood were at a house on Horton Drive in the Brentwood Addition in Anderson, Indiana, that they were cooking crack cocaine, and that they were about to leave the residence in a white four door Buick and would be going to Dean's address on West 34th Street. Detective Earley was familiar with the caller who had provided reliable information to him in the past, specifically, information leading to multiple search warrants and arrests.[1] Detective Earley was familiar

---

[1] At the December 12, 2013 hearing, Detective Earley testified that the source had previously provided:

with Dean and Hopgood, had prior dealings with them, including three previous arrests of Dean, was aware that Dean had drugs on him during these previous contacts, and was also aware that Dean was staying at a residence on 34th Street.

[3] Detective Earley left his residence, drove to the area in an undercover vehicle, and arrived there in approximately three minutes. Upon arriving, he observed a white four door Buick going south on Raible a half a block to a block south of Horton Drive. He followed the vehicle as it turned west on 34th Street and pulled into a residential driveway on its own. He called for backup, parked and exited his vehicle, walked up to the driver's side window of the Buick, and observed Hopgood whom he recognized in the driver's seat and Dean in the front passenger seat. Detective Earley's vehicle was parked in a position where Hopgood could not have backed straight out but "[t]here could have been" room for Hopgood to turn and "get out." Transcript at 357.

[4] At this time, Detective Earley was dressed in shorts, tennis shoes, and a t-shirt, but was wearing a badge hanging on a chain around his neck. The driver's side

Information which later led to a search warrant of a residence that resulted in the arrest of, I believe, three (3) individuals with marijuana. Two (2) other search warrants that were obtained. On one search warrant one individual was arrested with marijuana and a scale that tested positive for cocaine residue, and another search warrant in which three (3) people were arrested, uh, one (1) for possession of marijuana and two (2) for possession of marijuana and, uh, maintaining a common nuisance.

Transcript at 9-10.

window was down, and Detective Earley and Hopgood engaged in a conversation. Dean looked and saw Detective Earley, turned away, then stuck his right hand in his pants pocket, and started digging in his pocket. Dean's action caused Detective Earley concern because he "didn't know if he was possibly in possession of a handgun." *Id.* at 24. He asked Dean to remove his hand from his pocket, and Dean "[t]otally ignored" him. *Id.* at 25. He made the request "a couple times real quick," and with his right hand still in his right pants pocket Dean reached across his body and opened the front passenger door, jumped from the car, and took off running towards the front door of a house. *Id.*

[5] Detective Earley pursued Dean because he "felt like he had drugs or a weapon on him," announced that he was a police officer, and told Dean to stop. *Id.* at 311. Dean continued to run, opened the front door of the house, and, just as he slammed the door closed, Detective Earley forced the door open with his shoulder. Detective Earley saw Dean run to the kitchen, turn behind a refrigerator, and make a throwing motion with his hand. A clear baggie containing a white substance "came over the refrigerator landing on the floor out into the kitchen." *Id.* at 27. Detective Earley then grabbed Dean and took him to the ground. Dean screamed and yelled for his girlfriend, Olympia Hindman, and she appeared.

[6] At this point, Detective Earley had his gun in his right hand and Dean was seated with his back against a cabinet. Dean yelled at Hindman to pick up the baggie, and she "was moving like she was going to do so." *Id.* at 29. Dean

then grabbed Detective Earley's gun. Detective Earley pulled back, Dean reached and grabbed the gun a second time, and Detective Earley struck Dean on the forehead with his gun. Dean remained conscious and "continued fighting trying to get away from" Detective Earley, who was eventually able to secure him. *Id.* at 214.

[7] Anderson Police Officer Nick Durr took Dean into custody and rode in the ambulance with him and the medics to the hospital. At some point, Dean said that he wanted to speak to Detective Earley or Detective Stephon Blackwell and was transported to the police station.

[8] At the station, Detective Earley advised Dean of his *Miranda* rights, and Dean stated that he understood his rights. He was not stumbling or having trouble speaking. Detective Blackwell showed Dean a written rights waiver, which he refused to sign, stating that he did not want to sign it because he thought it would violate his probation or parole. He did not want to talk about his current case, but said that he wanted to work with Detective Earley and Detective Blackwell in exchange for charges being dropped against him and his girlfriend, Hindman. He said that he had been to Chicago with another individual numerous times to pick up kilos of cocaine and that they were due to make a trip two days later to pick up more cocaine. Dean did not talk about the facts of the instant case. Detective Earley did not record the interview because Dean did not want it to be recorded.

[9] Meanwhile, Detective Earley obtained a search warrant for the residence. The police discovered a box in a bedroom closet containing digital scales with white residue later determined to be cocaine residue. The police also discovered a gun and $14,000 in cash. Approximately 156 grams of cocaine were collected.

[10] On July 9, 2008, the State charged Dean with dealing in cocaine as a class A felony, maintaining a common nuisance as a class D felony, and resisting law enforcement as a class A misdemeanor. At some point, Dean bonded out and was not apprehended until more than four years later. On July 2, 2013, he filed a motion to suppress all property seized by the arresting officers, all observations made by the arresting officers, and all statements made by Dean. On December 12, 2013, the court held a hearing on the motion, and on April 24, 2014, denied it. The court's order stated: "The Court agrees with the opinion of the judge who issued the search warrant that the police conduct which led to observations of information establishing probable cause was justified." Appellant's Appendix at 26.

[11] In August 2014, Dean filed a motion to suppress any oral or written communications, confessions, statements, or admissions he had made. The court held a hearing on his motion at which his counsel argued that Dean's statements were not voluntary. The court denied the motion.

[12] On August 12, 2014, the court began a jury trial. During the testimony of Detective Earley, Dean's counsel objected to every piece of evidence discovered after Detective Earley's entry into the home based upon the arguments made at

the suppression hearing. The court overruled the objection and showed the objection as continuing. Detective Earley and Detective Blackwell as well as a number of other officers testified to the foregoing.

[13] Irene Nunn, the mother of Dean's girlfriend, testified that she owned the house where Dean was arrested and that she did not know the origin of the $14,000. Hindman testified that she took a buyout from a prior employer which closed its business of $70,000, that she had $22,000 at her house, and that the police took $22,000. She also testified that Dean never threw a bag of drugs or asked her to take it for him, that she lived in the house into which Dean had ran, that she saw mail delivered to that residence addressed to Dean, and that a prescription bottle in her room with Dean's name on it might have been left when Dean visited.

[14] Dean testified that Hopgood asked him to hold on to something for him after they arrived at the house on 34th Street, and that in response he opened the glove box, grabbed two bags of cocaine, and stuck one in each of his pockets. He testified that he opened the door, jumped out of the car, and ran towards the door of the house because he had crack in his pocket and because he was on probation. He said that Detective Earley never told him to stop. On recross-examination, Dean testified that he lied when he said that his address was the house where he was arrested.

[15] After the defense rested, the court and the attorneys discussed final instructions. State's Proposed Final Instruction No. 6 stated: "A warrantless arrest in the

home for a misdemeanor is permitted where there is immediate or continuous pursuit from the scene of a misdemeanor crime to the door of the home." *Id.* at 67. Defense counsel stated: "I don't have any legal basis for objecting to that one either, Judge." Transcript at 784. The trial court later read this instruction to the jury and provided the instruction as Final Instruction No. 12.

[16] During closing argument, the prosecutor made argument without objection. The jury found Dean guilty as charged. The court sentenced him to forty-three years for dealing in cocaine as a class A felony, three years for maintaining a common nuisance as a class D felony, and one year for resisting law enforcement as a class A misdemeanor, to be served concurrently for an aggregate sentence of forty-three years, with five years suspended to probation.

### *Discussion*

### I.

[17] The first issue is whether the court abused its discretion by admitting the evidence obtained after Dean left the car. We review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. Also, we may affirm a trial court's decision to

admit evidence seized as a result of a search based on any legal theory supported by the record. *Edwards v. State*, 724 N.E.2d 616, 620-621 (Ind. Ct. App. 2000), *trans. denied*. We review *de novo* a ruling on the constitutionality of a search or seizure, but we give deference to a trial court's determination of the facts, which will not be overturned unless clearly erroneous. *Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008); *see also Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) (holding that the ultimate determination of the constitutionality of a search or seizure is a question of law that we consider *de novo*).

[18] In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. *Carpenter*, 18 N.E.3d at 1001. If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon the trial evidence and may consider hearing evidence only if it does not conflict with trial evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 n.1 (Ind. 2014). It also considers the evidence from the suppression hearing that is favorable to the defendant only to the extent it is uncontradicted at trial. *Carpenter*, 18 N.E.3d at 1001.

A. *Encounter*

[19] Dean does not argue that Detective Earley's initial encounter with him, was unconstitutional under the Fourth Amendment. Rather, he contends that the initial encounter was consensual and that Detective Earley should have known that Dean was free to walk or even run away. He focuses on Detective Earley's

entry into the home. He asserts that neither a hunch that a defendant may have a weapon or concern for officer safety standing alone are sufficient to change a consensual encounter into an investigatory stop, nor can either justify a warrantless entry into a private home. He contends that the right to refuse a consensual encounter loses all meaning if doing so permits the police to change it to a second or third level investigation by giving chase and then arresting the person for fleeing. His position is that all evidence obtained after he left the car was inadmissible because it was all fruit of Detective Earley's violation of Dean's constitutional right to decline to engage in a consensual encounter. He also alleges that the evidence obtained following the search warrant is inadmissible because the probable cause for the warrant presumably came from the illegal entry.

[20] The State argues that the record is devoid of any showing by Dean that he had any expectation of privacy in the house into which Detective Earley pursued him. The State contends that, notwithstanding the lack of expectation of privacy, the trial court did not abuse its discretion because the encounter was initially consensual and Dean's conduct transformed the encounter into reasonable suspicion that criminal activity was afoot and allowed Detective Earley to stop him. The State asserts that Dean's actions were not merely a simple demonstration that he did not wish to engage with the officer or he was ignoring the officer, and that Dean's headlong flight and the information received by Detective Earley provided a sufficient reasonable basis for the detective to suspect that Dean was up to some criminal activity.

In his brief, Dean mentions both the Fourth Amendment and Article 1, Section 11 of the Indiana Constitution. However, he fails to provide an independent analysis of the Indiana Constitution. Failure to make a cogent argument under the Indiana Constitution constitutes waiver of the issue on appeal. *See Abel v. State*, 773 N.E.2d 276, 278 n.1 (Ind. 2002) (holding that because the defendant presented no authority or independent analysis supporting a separate standard under the state constitution, any state constitutional claim is waived). Thus, we focus on the Fourth Amendment to the United States Constitution which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Encounters between law enforcement officers and public citizens take a variety of forms, some of which do not implicate the protections of the Fourth Amendment and some of which do. *Clark v. State*, 994 N.E.2d 252, 261 (Ind. 2013) (citing *Finger v. State*, 799 N.E.2d 528, 532 (Ind. 2003)). Consensual encounters in which a citizen voluntarily interacts with an officer do not compel Fourth Amendment analysis. *Id.* Nonconsensual encounters do, though, and typically are viewed in two levels of detention: a full arrest lasting longer than a short period of time, or a brief investigative stop. *Id.* The former of these

requires probable cause to be permissible; the latter requires a lower standard of reasonable suspicion. *Id.*

[23] Dean concedes that the initial encounter was consensual. Thus, we address Detective Earley's order that Dean stop and the statute governing resisting law enforcement. At the time, the offense of resisting law enforcement as a class A misdemeanor was governed by Ind. Code § 35-44-3-3, which provided that "[a] person who knowingly or intentionally . . . flees from a law enforcement officer after the officer has, by visible or audible means . . . identified himself or herself and ordered the person to stop . . . commits resisting law enforcement, a Class A misdemeanor . . . ."[2] In its charging information, the State alleged that Dean "did knowingly or intentionally flee from Kevin Earley, a law enforcement officer, after said officer identified themselves [sic] by visible or audible means and visibly or audibly ordered said defendant to stop . . . ." Appellant's Appendix at 17.

[24] The Indiana Supreme Court has held that in order to interpret the resisting law enforcement statute as constitutional the "statutory element 'after the officer has . . . ordered the person to stop' must be understood to require that such order to stop rest on probable cause or reasonable suspicion, that is, specific, articulable facts that would lead the officer to reasonably suspect that criminal activity is afoot." *Gaddie v. State*, 10 N.E.3d 1249, 1255 (Ind. 2014).

---

[2] Subsequently repealed by Pub. L. No. 126-2012, § 53 (eff. July 1, 2012), and replaced by Ind. Code § 35-44.1-3-1.

Reasonable suspicion must be comprised of more than hunches or unparticularized suspicions. *Clark*, 994 N.E.2d at 263. "In other words, the stop 'must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'" *Id.* at 263-264 (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690 (1981)). "[T]he totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 264 (quoting *Cortez*, 449 U.S. at 417-418, 101 S. Ct. 690). In discussing evidence of reasonable suspicion, the Court has held that refusal to cooperate with police must be distinguished from unprovoked flight. *Gaddie*, 10 N.E.3d at 1256. "Nervous, evasive behavior is another pertinent factor in determining reasonable suspicion . . . and headlong flight is the consummate act of evasion." *Illinois v. Wardlow*, 528 U.S. 119, 119, 120 S. Ct. 673, 674 (2000). In assessing the whole picture, we must examine the facts as known to the officer at the moment of the stop. *Clark*, 994 N.E.2d at 264. We review findings of reasonable suspicion *de novo*. *Id.* This is necessarily a fact-sensitive inquiry. *Id.*

[25] We disagree with Dean's characterization that he was merely attempting to avoid a consensual encounter. Rather, the record reveals that Dean jumped from the car and took off running. Based upon the record, including that the caller had previously provided reliable information leading to arrests, Detective Earley's confirmation of the caller's statements regarding the location and vehicle of Dean and Hopgood, and Dean's behavior, including refusing to

remove his hand from his pocket and headlong flight, we conclude that Detective Earley had reasonable suspicion to suspect that criminal activity was afoot and to order Dean to stop.[3] *See Hardister v. State*, 849 N.E.2d 563, 570-571 (Ind. 2006) (holding that the residents' headlong flight toward the rear of the house coupled with the anonymous tip and the location in an area known for narcotics traffic furnished reasonable suspicion justifying an investigatory stop of the fleeing occupants and that the officers' efforts to intercept the fleeing pair were therefore justified as necessary to pursue the investigation); *see also Murdock v. State*, 10 N.E.3d 1265, 1268 (Ind. 2014) (holding that while refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," and concluding that reasonable suspicion existed where the defendant ran when the officer appeared, engaged in furtive and evasive activity in a high-crime area, was uncooperative, and matched the description of the suspect).

[26] We next turn to Detective Earley's entry into the house. To the extent that the State argues the record is devoid of any showing by Dean that he had any expectation of privacy in the house into which Detective Earley pursued him, we note that the State acknowledges that this argument was not made to the

---

[3] Dean argues that the evidence was insufficient to sustain his conviction for resisting law enforcement as a class A misdemeanor because Detective Earley did not have a reasonable and articulable suspicion that Dean was, had been, or was about to be engaged in criminal activity. Because we conclude that Detective Earley had reasonable suspicion to order Dean to stop and the facts most favorable to the conviction reveal that Dean continued running, we cannot say that the evidence was insufficient.

trial court. We further note that, while Dean testified that he never stayed at the residence on 34th Street, that he did not live there, and that he lied when he said that his address was the house where he was arrested, the prosecutor argued in closing that "[t]hat's his house. He has an ownership interest in it." Transcript at 801. The Indiana Supreme Court has held that, "[w]here the prosecution has failed to make any trial court challenge to standing, the government may not raise the issue for the first time on appeal" and that "[l]ikewise, in resolving a claim of unlawful search and seizure, an appellate court should not invoke lack of standing, *sua sponte*." *Everroad v. State*, 590 N.E.2d 567, 569 (Ind. 1992), *reh'g denied*. Even assuming that Dean's testimony admitting that he did not live at the house allowed the State to argue a lack of an expectation of privacy in the house on appeal, we need not address the issue of waiver because we conclude that Detective Earley did not improperly enter the house.

[27] When there is probable cause to believe a person has just committed a crime and is in a particular dwelling, police may make a warrantless arrest in the home. *Hardister*, 849 N.E.2d at 571. In addressing the warrantless entry into a home, the United State Supreme Court has held that an action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action. *Brigham City, Utah v. Stuart*, 126 S. Ct. 1943, 1948 (2006).

[28] Further, "officers may enter the home if they are in 'hot pursuit' of the arrestee or if exigent circumstances justified the entry." *Barnes v. State*, 946 N.E.2d 572,

576 (Ind. 2011), *adhered to on reh'g*, 953 N.E.2d 473 (Ind. 2011). *See also United States v. Santana*, 427 U.S. 38, 43, 96 S. Ct. 2406, 2410 (1976) (holding that a suspect may not defeat an arrest which has been set in motion in a public place by the expedient of escaping to a private place). "Traditionally, exigent circumstances have been found [] where: 1) a suspect is fleeing or likely to take flight in order to avoid arrest; 2) incriminating evidence is in jeopardy of being destroyed or removed unless an immediate arrest is made; and 3) in cases that involve hot pursuit or movable vehicles." *Snellgrove v. State*, 569 N.E.2d 337, 340 (Ind. 1991). This court has previously held:

> Law enforcement is not a child's game of prisoners base, or a contest, with apprehension and conviction depending upon whether the officer or defendant is the fleetest of foot. A police officer in continuous pursuit of a perpetrator of a crime committed in the officer's presence, be it a felony or a misdemeanor, must be allowed to follow the suspect into a private place, or the suspect's home if he chooses to flee there, and effect the arrest without a warrant. A contrary rule would encourage flight to avoid apprehension and identification, even at dangerously high speeds as here, with the natural destruction of evidence accomplished while the officer interrupted his pursuit to obtain a warrant.

*State v. Blake*, 468 N.E.2d 548, 553 (Ind. Ct. App. 1984).

[29] Given our conclusion that Detective Earley had reasonable suspicion to order Dean to stop, Detective Earley's testimony that Dean continued running after he had ordered him to stop, as well as the other circumstances noted, we conclude that Detective Earley had probable cause to believe that Dean had just

committed a crime and was in hot pursuit. Under the circumstances, we cannot say that the challenged evidence is inadmissible based upon Detective Earley's pursuit of Dean. *See Lepard v. State*, 542 N.E.2d 1347, 1350 (Ind. Ct. App. 1989) (holding that the officers had probable cause to believe the defendant had committed the misdemeanors of driving while intoxicated and resisting law enforcement and that there was an immediate and continuous pursuit which created an exigent circumstance permitting them to enter the defendant's home and affirming the trial court's denial of the defendant's motion to suppress), *reh'g denied*; *Blake*, 468 N.E.2d at 550-553 (observing that a police officer had probable cause to believe the defendant had committed resisting law enforcement as a class A misdemeanor and the officer had good reason to believe that the defendant would continue his flight if he left the site to procure an arrest warrant, and holding that the officer's pursuit of the defendant into his home in order to apprehend him without a warrant was justified).[4]

---

[4] We note that the United States Supreme Court recently observed that federal and state courts nationwide are sharply divided on the question whether an officer with probable cause to arrest a suspect for a misdemeanor may enter a home without a warrant while in hot pursuit of that suspect. *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013). The Court specifically expressed no view on whether the officer's entry into a yard in pursuit of a suspect was constitutional. *Id.* at 7. *Lepard* and *Blake* cited above both held that entries by the police into a house were proper when they had probable cause to believe that the person had just committed a misdemeanor. *See Lepard*, 542 N.E.2d at 1350; *Blake*, 468 N.E.2d at 550-553. We need not revisit this issue as Dean raises no argument that Detective Earley's entry into the house was improper because Detective Earley had only probable cause that Dean had committed a misdemeanor.

B. *Statements*

Dean argues that the trial court erred in admitting his statements to Detective Earley and Detective Blackwell because Ind. Evidence Rule 617(a)(2) was not followed. Dean acknowledges that Rule 617 was enacted in 2011, but argues that it should be applied retroactively because it established a new rule for the conduct of criminal prosecutions and his case was pending on direct review or not yet final. He also asserts that he was prejudiced by the admission of his statements. The State argues that Dean waived his claim that the statements were inadmissible due to a violation of Rule 617 because he never linked the lack of recording to Rule 617. The State also argues that Rule 617 is not applicable to Dean's June 15, 2008 interview with the police.

Ind. Evidence Rule 617 provides:

> (a) In a felony criminal prosecution, evidence of a statement made by a person during a Custodial Interrogation in a Place of Detention shall not be admitted against the person unless an Electronic Recording of the statement was made, preserved, and is available at trial, except upon clear and convincing proof of any one of the following:
>
> * * * * *
>
> > (2) Before or during a Custodial Interrogation, the person agreed to respond to questions only if his or her Statements were not Electronically Recorded, provided that such agreement and its surrounding colloquy is Electronically Recorded or documented in writing . . . .

During the trial, Dean's counsel did not mention Rule 617. Moreover, the Indiana Supreme Court issued an Order Amending Rules of Evidence on September 15, 2009, which added Rule 617 and provided that Rule 617 "shall apply only to statements made on or after January 1, 2011." Order Amending Rules of Evidence, No. 94S00-0909-MS-4 (Ind. 2009), *available at* http://www.in.gov/ilea/files/Evidence_Rule_617.pdf. Accordingly, Rule 617 does not apply retroactively and Dean is not entitled to reversal on this basis.

II.

The next issue is whether the court's Final Instruction No. 12 regarding a warrantless arrest in the home resulted in fundamental error. Generally, "[t]he purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Overstreet v. State*, 783 N.E.2d 1140, 1163 (Ind. 2003), *cert. denied*, 540 U.S. 1150, 124 S. Ct. 1145 (2004). Instruction of the jury is generally within the discretion of the trial court and is reviewed only for an abuse of that discretion. *Id.* at 1163-1164. To constitute an abuse of discretion, the instruction given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. *Benefiel v. State*, 716 N.E.2d 906, 914 (Ind. 1999), *reh'g denied*, *cert. denied*, 531 U.S. 830, 121 S. Ct. 83 (2000). Before a defendant is entitled to a reversal, he or she must affirmatively show that the erroneous instruction prejudiced his substantial rights. *Gantt v. State*, 825 N.E.2d 874, 877 (Ind. Ct. App. 2005). An error is to

be disregarded as harmless unless it affects the substantial rights of a party. *Oatts v. State*, 899 N.E.2d 714, 727 (Ind. Ct. App. 2009).

[34] As acknowledged by Dean, he did not object to the jury instruction. To circumvent waiver, he contends that the instruction resulted in fundamental error. Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." *Id.* "This exception is available only in 'egregious circumstances.'" *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (quoting *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)), *reh'g denied*. "Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *reh'g denied*.

[35] Dean argues that the question of whether Detective Earley was legally permitted to enter the residence was a matter of admissibility to be resolved by the court and not the jury. He asserts that Final Instruction No. 12 misled the jury, it created a presumption of guilt without the possibility of rebutting it, and the State used the instruction to disparage and invalidate his theory of defense. Dean also contends that "at least six (6) weeks prior to trial the Indiana Supreme Court had substantially clarified the legal gray area regarding when

choosing to ignore a law enforcement officer's request/order to remain still and submit to an encounter is or is not a crime." Appellant's Brief at 29 (citing *Gaddie*, 10 N.E.3d at 1254-1255; and *Griffin v. State*, 997 N.E.2d 375, 378-379 (Ind. Ct. App. 2013), *trans. granted*, *order granting transfer vacated, trans. denied*). The State argues that Final Instruction No. 12 was a correct statement of the law, that the evidence supported giving the instruction, and the substance of the instruction was not covered by other instructions.

Final Instruction No. 12 stated: "A warrantless arrest in the home for a misdemeanor is permitted where there is immediate or continuous pursuit from the scene of a misdemeanor crime to the door of the home." Appellant's Appendix at 71. As noted herein, the Court in *Gaddie* held that in order to interpret the resisting law enforcement statute as constitutional, the "statutory element 'after the officer has . . . ordered the person to stop' must be understood to require that such order to stop rest on probable cause or reasonable suspicion, that is, specific, articulable facts that would lead the officer to reasonably suspect that criminal activity is afoot." 10 N.E.3d at 1255. In *Griffin*, the other case cited by Dean, the court held that "[c]itizens are obliged to obey a police officer's order to stop when the officer has probable cause or reasonable suspicion to believe that criminal activity may be afoot." 997 N.E.2d at 377. The court also held: "When there is no indication of possible criminal activity, does a citizen who walks away commit the crime of resisting arrest by departing? We think it cannot be so, consistent with the Fourth Amendment . . . ." *Id.* The court also observed that the State explicitly argued

that it need not establish any facts giving rise to probable cause or articulable suspicion that would have warranted detaining the defendant in order to sustain the conviction. *Id.* at 380. We cannot say that *Gaddie* or *Griffin* indicate that Final Instruction No. 12 was an incorrect statement of the law. Based on our review of the jury instructions as a whole and all other relevant information presented to the jury, we conclude that Final Instruction No. 12 did not deprive Dean of a fair trial so as to constitute fundamental error.

## III.

[37] The next issue is whether the prosecutor committed misconduct during closing argument which resulted in fundamental error. In reviewing a properly preserved claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. *Cooper*, 854 N.E.2d at 835. Whether a prosecutor's argument constitutes misconduct is measured by reference to caselaw and the Rules of Professional Conduct. *Id.* The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.*

[38] When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. *Id.* If the party is not satisfied with the admonishment, then he should move for mistrial. *Id.* Failure to request an admonishment or to move for mistrial results in waiver.

*Id.* Here, Dean did not object to the statements of the prosecutor during closing argument. Thus, he has waived the issue.

[39] Where, as here, a claim of prosecutorial misconduct has not been properly preserved, our standard of review is different from that of a properly preserved claim. *Id.* More specifically, the defendant must establish not only the grounds for the misconduct, but also the additional grounds for fundamental error. *Id.*

[40] Dean argues that the prosecutor and deputy prosecutor denounced defense counsel's integrity, vouched for the credibility of State witnesses, inflamed jurors' passions, referred to evidence that had not been introduced during the trial, offered personal opinions, and misstated the law. The State asserts that defense counsel attacked the credibility of the officers, the prosecutor's statements were in response to defense counsel's comments, and that, even if some of the prosecutor's statements were improper, they did not raise to the level of fundamental error.

[41] During closing argument, the prosecutor stated:

> [Defense counsel] also was making a big deal again about this cover-up, this . . . this conduct. He went into the house without a warrant and, you know what, that . . . that's so terrible. But you know what the law says and what the Judge is going to tell you? That a warrantless arrest in the home for a misdemeanor is permitted where there is immediate or continuous pursuit from the scene of a misdemeanor crime to the door of the home. Police officer can also arrest a person without a warrant if he has probable cause to believe that the person is committing or attempting to commit a misdemeanor in his presence. What

misdemeanor was that? That was resisting law enforcement, which is also defined and it's a charge in this case. The defendant knowingly or intentionally fled from a law enforcement officer, Detective Earl[e]y, after the law enforcement officer had by visible or audible means identified himself.

Transcript at 800.

[42] During his closing argument, defense counsel stated that Detective Earley was "familiar with the appeals and he knows about the 4th Amendment. He knows about the exceptions. He created the exception!" *Id.* at 804. Defense counsel also stated:

> The State does a lot about this (hand banging on table twice) this gun. He's not even charged with the gun! Don't fall for that! It's . . . it's a herring, it's a red herring, it's a pink elephant. They're throwing it out there for prejudice. That's it! There's no reason to bring that gun in here. He's not charged with it. It doesn't prove anything. There's . . . there's not even any fingerprints on it. Why are they bringing this in front of you? Because they want you to believe he's guilty because there's a gun in the house. He didn't have a gun in the car. Earl[e]y didn't even see a gun. Earl[e]y got in that house because he chased after Bobby Dean. Why did he chase after Bobby Dean? Detective Earl[e]y is a lion, he's an alpha male. He ran after Bobby Dean because Bobby Dean ran. And he knew it, and that's the only reason why he went after him. He set the whole thing up.

*Id.* at 806. Defense counsel further argued that Detective Earley

> wants you to believe that he was standing over Bobby Dean with a gun to his head and that Bobby Dean either from this position

or this position reached up and grabbed the barrel of his gun.
Really? Does that even make sense. Who is on the ground with
an officer with a gun pointing at them and actually grabs the
barrel while it was near your head? It just doesn't even make any
sense. It's a reason, it's an excuse that therefore justifies his use
of force.

*Id.* at 807. With respect to the money, defense counsel stated:

They have no proof that Bobby Dean had that money. The
money that was in the house. They . . . they don't even have him
making it to the bedroom. They don't have him at the house
earlier that day. They've got a pill bottle from January of 2008.
That's what they got. They have no absolute proof that he was
ever there in that room, especially on that given day. Now
Nicole Hindman, she sits up here and she did testify. She said I
had a buyout. Her mom says I came in the room earlier, I saw
the money on the dresser and I just shook my head like why do
you have all that money in my house. All right? She probably
shoulda had it in the bank. You know? There's . . . there's no
doubt about it. Is that the wisest thing to do? To have that kind
of money around? No. You know, probably not real wise but
there are people who don't use banks. You know? Was . . . is
Nicole Hindman the sharpest knife in the box? Is she the
smartest person I've ever met or seen before? Probably not.
Probably not.

*Id.* at 808-809. Defense counsel also argued:

Olympia Hindman, Irene Nunn or Lisa Nunn, they got no
reason to lie about . . . the ladies saw him getting beat or hit.
They're just . . . they're not lying about that. It didn't happen
how [Detective Earley] said it happened. That's the first lie.
That's the first lie. You know he's lying about that. . . . He's
covering it up. He has to. You can't . . . you can't continue to

move forward in your career if you've stuff like that on your jacket or in your record. He can't. He can't allow it to be out that he lost his temper, he ran after Dean and that he set it up. He can't.

*Id.* at 813.

[43] On rebuttal, the prosecutor argued:

I've been doing this for a pretty long time. I'm not sure I've heard much like that before. I'm really not. Oh, man, this is devastating our community. This is a community that's devastated by the illegal drug activity and how a man like that can come in here and somehow make an argument about that for him it's offensive. Kevin Earl[e]y is a police officer this community should be very proud of. I live here and I'm very proud of the way he acted on that day. . . . He lives near that side of town. I know where he lives. Doesn't live far from me. I know where Mr. Earl[e]y lives and it's not far from where this happened. Cause we live in this community. We live where this stuff is happening. And he got out of his house on his day off, on Father's Day, went to investigate this. And, if he hadn't, that stuff would still be on the streets. I'm glad he did that.

\* \* \* \* \*

And somehow Kevin Earl[e]y is out of control because he chases Bobby Dean into the house. I guess he should've just let him go. Just let him go. You can't follow him. I'm in my house, you can't follow me, I'm in my house! It's not the way it goes. And, if that was the law, we wouldn't be here and we wouldn't be hearing, the Judge wouldn't even let you hear this case. If that's the law, he wouldn't even let you hear this case. That's not the law. If you run from the police and they tell you to stop, you have to stop.

*Id.* at 816-817. The prosecutor later stated:

> Let me see, [defense counsel] say [sic]? Olympia Hindman has
> no reason to lie. She's got every reason to lie. Her baby daddy is
> going to go to prison if she doesn't come up here and lie and help
> him concoct a story to get away with this. What do you mean
> she's got no reason to lie? What kind of a ridiculous thing is that
> to say and thinking you're going to believe it? Are you kidding
> me? She's got now reas . . . every single person that testified had
> a reason to lie. And most of them did. The money. My money.
> Are you kidding me? And why did the Feds take it? Cause it's
> product of drug activity. If that was her money and she showed
> even a scintilla of evidence that that was her money, she
> wouldn't have lost that money. That money would've been . . .
> that money would've went back to her.

*Id.* at 819-820. The prosecutor also stated:

> If you're really fooled by all this nonsense you heard over here on
> this side of the room this week, you go ahead and send him
> home. But, if you want to do justice and you want to stand up
> for what's right and you want to do the right thing, you want to
> follow the law and you want to stand up for your community,
> convict this guy cause he's guilty.

*Id.* at 825.

[44]    With respect to Dean's argument that the prosecutors' comments were
derogatory, Dean relies upon *Collins v. State*, 966 N.E.2d 96 (Ind. Ct. App.
2012). In *Collins*, the defense counsel argued in closing that her client had no
previous conviction, and the prosecutor stated: "Judge, I'm going to object
Counsel knows that that—very well that her client was convicted. It was

reduced to a misdemeanor, and that is contained within the psychiatric records as well as the other health records that we received." 966 N.E.2d at 107. On appeal, the court observed that there was nothing in the record to establish that the defendant was in fact convicted of the charge or that defense counsel knew there was a conviction. *Id.* The court held that the prosecutor's comment "cast defense counsel in a derogatory fashion, portraying her as a liar, or at least suggesting that she was dishonest with the jury." *Id.* The court concluded that the prosecutor's comments disparaging defense counsel and mischaracterizing the evidence to reflect that the defendant had a prior conviction presented an undeniable and substantial potential for harm. *Id.*

[45] We cannot say that the prosecutor's comments in this case rise to the level of those in *Collins*. To the extent that Dean challenges the prosecutor's statements regarding the witnesses' truthfulness, we observe that the Indiana Supreme Court has held that a prosecutor does not necessarily engage in misconduct by characterizing a defendant as a liar. *Cooper*, 854 N.E.2d at 836. Rather, "a prosecutor may comment on the credibility of the witnesses as long as the assertions are based on reasons which arise from the evidence." *Id.* "A prosecutor, in final arguments, can 'state and discuss the evidence and reasonable inferences derivable therefrom so long as there is no implication of personal knowledge that is independent of the evidence.'" *Hobson v. State*, 675 N.E.2d 1090, 1096 (Ind. 1996) (quoting *Kappos v. State*, 577 N.E.2d 974, 977 (Ind. Ct. App. 1991), *trans. denied*). Some of the prosecutor's comments were merely responses to the arguments raised by defense counsel in his closing

argument. "Prosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable." *Dumas v. State*, 803 N.E.2d 1113, 1118 (Ind. 2004).

[46] With respect to Dean's argument that the prosecutor inflamed jurors' passions, we note that it may be misconduct for a prosecutor to ask a jury to convict a defendant for any reason other than his guilt, or to attempt to inflame the passions or prejudices of the jury. *Wisehart v. State*, 693 N.E.2d 23, 59 (Ind. 1998), *reh'g denied*, *cert. denied*, 526 U.S. 1040, 119 S. Ct. 1338 (1999). Indeed, the Indiana Supreme Court has disapproved of prosecutors invoking a general concern for "community safety" as a legitimate basis for returning a guilty verdict. *See Maldonado v. State*, 265 Ind. 492, 501, 355 N.E.2d 843, 849 (1976) (finding error in the prosecutor arguing, "this may be the most important thing you'll ever do for your community"). However, Dean brings his challenge under the fundamental error exception, which is extremely narrow and is "available only in 'egregious circumstances,'" *Brown*, 929 N.E.2d at 207, and we cannot say that he has demonstrated fundamental error in this regard.

[47] While some of the comments may have been improper, the jury was instructed: "You are the exclusive judges of the evidence, which may be either witness testimony or exhibits." Appellant's Appendix at 72. The jury was also instructed that "[s]tatements made by the attorneys are not evidence." *Id.* at 73. Even if we assumed some of the prosecutor's arguments or comments were misconduct, we are not persuaded that the comments during the prosecutor's argument created "an undeniable and substantial potential for harm." *Cooper,*

854 N.E.2d at 835. Given the evidence presented at the trial, including Dean's testimony that he grabbed two bags of cocaine, opened the car door, jumped out of the car, and ran into the house, and the jury instructions, we conclude that any prejudicial impact caused by the prosecutor's statements was minimal and that the prosecutor's statements do not constitute fundamental error. Dean is not entitled to a new trial on this basis.

## *Conclusion*

[48] For the foregoing reasons, we affirm Dean's convictions.

[49] Affirmed.

Barnes, J., and Crone, J., concur.