## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 14 2020, 7:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Yvette M. LaPlante
LaPlante LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Willie Steverson,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | February 14, 2020<br><br>Court of Appeals Case No.<br>19A-CR-2286<br><br>Appeal from the Vanderburgh<br>Circuit Court<br><br>The Honorable Gary Schutte,<br>Magistrate<br><br>Trial Court Cause No.<br>82C01-1905-F5-3719 |

**Brown, Judge.**

[1] Willie Steverson appeals his conviction for battery as a level 5 felony. He raises two issues:

    I.    Whether the trial court abused its discretion in excluding evidence of the victim's pending CHINS case; and

    II.    Whether the court abused its discretion in instructing the jury.

We affirm.

### Facts and Procedural History

[2] On May 17, 2019, B.C. was walking home and encountered Steverson, whom she had been dating on and off for three years. Steverson was hostile at first and called her a "b----," and B.C. went with him inside an apartment located near the intersection where they had met. Inside, "[e]veryone was getting high," Steverson immediately pulled out a pipe, and he and B.C. began smoking methamphetamine. Transcript Volume II at 41. At some point, Steverson requested that he and B.C. go for a walk, and as they left, she did not have her cellphone. The pair walked down an alley, Steverson "kept saying, baby you know I love you right, you know I love you," and B.C. "just got a sick feeling" in her stomach. *Id.* at 43. Upon entering a side door of an abandoned residence, "[i]t just turned all bad," Steverson became angry and told B.C. that he saw messages on her phone and thought she was cheating on him, and B.C. grew frantic. *Id.* at 44. Steverson dragged her to a hallway, hit her, called her a "wh---" and a maggot, and stated that he should kill her. *Id.* He pulled her hair, dragged her into a bedroom, and smacked her with an open fist. She saw someone in the neighbor's yard, and when she fell into a closet, Steverson said,

"B----, if you do not, if you don't be quite [sic]," and "I'm going to lock you in this closet and catch this house on fire." *Id.* at 45-46. He entered the closet, closed the door, and hit her again with an open fist. She pled with him that she could not breathe, they exited the closet, and he hit her with a closed fist because she told him she did not cheat on him. Steverson then accused B.C. of stealing a pipe, she explained she did not have anything of his on her, and for the subsequent thirty to forty-five minutes, he smoked while she searched for the pipe. At some point, he choked her with his hands and "kept hitting" her head with a metal flashlight. *Id.* at 49. Giving up on searching for the pipe, they exited the house from the back door, and Steverson said, "B----, don't make a scene." *Id.* at 47.

[3] After cutting through the backyard and alley, B.C. saw some people down the street, screamed, and "made a scene hollering about [her] cellphone and took off" to her house. *Id.* at 49. When she arrived, her roommate noticed her demeanor and stopped her, and B.C. broke down, explained what had happened, and called the police. Evansville Police Officer Jeff Worthington responded to the dispatch, found B.C. distraught, crying, and hyperventilating, and called an ambulance, which took her to the hospital. Evansville Police Detective Brian Turpin met with her at the hospital, and the police took photographs of her injuries. Detective Turpin later interviewed Steverson at the police department after advising him of his *Miranda* rights, and the interview was recorded.

[4] On May 28, 2019, the State charged Steverson with battery as a level 5 felony, and the information explained that the charge was enhanced to a level 5 felony because he was convicted and sentenced for domestic battery with moderate bodily injury on January 16, 2019, in cause number 82C01-1808-F6-5815. On June 15, 2019, the State added a count of attempted invasion of privacy as a level 6 felony, to which Steverson later pled guilty.

[5] On July 24, 2019, the State filed several motions in limine, including one that moved the court to prevent Steverson from offering into evidence, or making reference to any evidence of, B.C.'s "illicit drug use prior to [] May 17, 2019, and any evidence of pending or closed CHINS matters" involving her. Appellant's Appendix Volume II at 39. Following a hearing and argument, the court took the motion under advisement and indicated concern and preference that, "before going into anything with the CHINS case" or "anything gets slippery or out of control," a hearing outside the presence of the jury would be held to clarify the direction of the testimony. Transcript Volume II at 22-23. A chronological case summary administrative event entry for July 29, 2019, states: "State[']s Motions in Limine are granted pending testimony given." Appellant's Appendix Volume II at 11.

[6] During the jury trial, the State called B.C. as a witness, and she recounted the incident of May 17, 2019. She answered affirmatively when asked if she smoked meth while in the apartment and stated that she smoked once while in the abandoned residence before being accused of stealing from Steverson. After the court admitted pictures of B.C. and her injuries as State's Exhibits 1-28 and the

State ended its direct examination, Steverson's counsel made an offer of proof and examined B.C. outside of the jury's presence. B.C. answered affirmatively when asked whether, at the time of the incident, she had a pending CHINS matter related to one of her children, whether she was participating in CHINS drug court, and whether there were rules about testing positive or using illicit drugs. She indicated that she was in court sometime before May 17th and that the court held her in contempt but suspended the executed sentence. When asked if that was for a violation, she answered affirmatively, and when asked further about the violation, she stated: "I wasn't doing what I was supposed to be doing" and "wasn't doing my drops," or her drug tests. Transcript Volume II at 53. She agreed with statements of Steverson's counsel that "smoking methamphetamine would have triggered another violation report" and that, from her perspective, when "the CHINS court says, I'm going to hold you in contempt for not doing, not following the rules, was it kind of I'm going to give you one last chance." *Id.* When Steverson's counsel added, "Before I put you in jail," B.C. stated, "Yeah, I've been on thin ice for awhile with them." *Id.* She agreed further with his counsel's statements that she had a "pretty big" interest to not test positive and that she believed that she was "probably going to go to jail." *Id.* at 54. When asked if she believed that she would lose custody of her children, she stated, "No." *Id.*

[7] When the prosecutor was asked to respond to the offer of proof, the following exchange occurred:

THE STATE[]: [B.C.], what the result, so that's in April, May 17th happens, you admittedly smoke meth, what happens at your next appearance in CHINS Drug Court?

A Their exact words were they put me in jail to get me off the street, to get me clean and for my safety.

THE STATE[]: And how long were you in jail for that sanction?

A One week, and then I went to Stepping Stone.

THE STATE[]: And, when you say you went to Stepping Stone, was that inpatient treatment or outpatient treatment?

A Inpatient.

THE STATE[]: Inpatient treatment. At the time of the staying the executed sentence for contempt to the time of this incident, you did not believe that you were going to lose your kids if you dropped dirty, is that correct?

A No.

THE STATE[]: Okay. Did you make any of this story up to avoid the CHINS Drug Court sanction?

A No.

THE STATE[]: Did they ask you, did they drug test you and you drop dirty, or did you just say, I smoked?

A I told them.

THE STATE[]: You told them?

A Yeah. I didn't fail any drops.

*Id.* at 54-55. B.C. answered "90 days" when Steverson's counsel asked if she remembered the amount of jail time she faced when they held her in contempt

but then suspended it. *Id.* at 56. When asked if, after she "disclosed all these events, the [c]ourt did not impose the full amount of the sentence," she answered in the negative and stated: "I had a choice." *Id.* She indicated that she did not ever deny to anyone that she had smoked meth. She answered affirmatively when Steverson's counsel asked if she told Detective Turpin on May 17th she was forced to smoke meth and whether she told hospital staff she was forced to smoke meth, and she answered in the negative when asked if she told her case manager that she was forced to smoke meth.

[8] Steverson's counsel offered her testimony under Ind. Evidence Rule 616 and argued it was relevant and admissible, he believed a valid theory of defense to be that "she smokes meth, she knows that she's on thin ice, she knows that she's probably going to go to jail if she gets caught, and so as the [c]ourt is aware, when people have PTR's, they're going to try to come in with some reason, some excuse," he was "sort of hamstrung to present a full theory of defense" if the jury was not informed that there was a penalty or a consequence to her smoking meth, and that she received "some benefit to the version she presented to the CHINS [c]ourt." *Id.* at 60. In denying Steverson's motion, the court stated that it did not know that "we've established that she has a particular bias" against Steverson, that "what drives the day" was that she was honest with the CHINS manager and still did receive executed time, and that "she didn't get the full 90 days, but I don't know that we can attribute that to anything." *Id.* at 61-62. After pointing to B.C.'s testimony that "she never thought she was going to lose her children," it stated: "There's a difference between irrelevant and

admissible evidence, it may be relevant, as [the State] touched on, there's a lot of relevant information, it does open up a pandora's box of issues." *Id.* at 62.

[9] During testimony from Detective Turpin, clips from his interview with Steverson were admitted as State's Exhibits 86 and 87. When it was published to the jury, State's Exhibit 86 consisted of the following:

> [Steverson]: I'm telling you the truth man, we got, okay we got (inaudible) each other though, it wasn't nothing like that, she (inaudible) she's going to do that (inaudible).
>
> DETECTIVE TURPIN: So, what happened, what happened, what did she do to you that caused you to do that?
>
> [Steverson]: Well, I don't know man, got in this argument and got in a f---ing fight man, you know what I'm saying.
>
> DETECTIVE TURPIN: So, where are your injuries?
>
> [Steverson]: What do you mean?
>
> DETECTIVE TURPIN: Where are your injuries?
>
> [Steverson]: Injuries.
>
> DETECTIVE TURPIN: Injuries, yeah, what did she do to you, so if you have a mutual, if you and I, if we take the cuffs off, I'm not going to do this, this is not a threat in any way, if we take the cuffs off, even though I'm seriously old, when we leave here, if we decide to go at it, even though I'm seriously old, you're going to have injuries, I'm going to have injuries. You're a lot younger than me and probably in a lot better shape, so I'm probably going to have more injuries, but you're going to have some injuries, I guarantee you, because that's what a mutual fight does, that's what I'm trying to tell you. I keep telling you I know this story inside and out and I need you to understand I get it man, you found out she's cheating on you, you get fired up about that,

people do all the time, it's understandable. I'm not saying that
that makes you an awful person.

[Steverson]: She got (inaudible), so I told her, she's got to run,
(inaudible) and I'm like listen man, (inaudible), stop hitting me
man, you know, get the f--- off of me and stop hitting me, but it
wasn't until she had, it wasn't until she had (inaudible).

*Id.* at 103-104. State's Exhibit 87 was published to the jury and contained

Steverson's statement that "(Inaudible) some little small domestic a-- b---s---."

*Id.* At the end of the trial, Steverson's counsel proposed a final instruction on

the use of force to protect person or property based on "IN Pattern Instruction

No. 10.0300, I.C. 35-41-3-2," Appellant's Appendix Volume II at 64, stated

that, in the interview shown in State's Exhibit 86, Steverson "says you know,

well she gets rowdy, she jumped on me and I just sort of, and did like a hand

motion of pushing her off," and argued that there was evidence, "if she jumps

on him first, despite the lack of injuries," that pushing B.C. off was acting in

self-defense. Transcript Volume II at 114. The State objected and argued that

allowing the self-defense instruction and permitting him to argue self-defense in

closing "opens the door to [Ind. Evidence Rule] 404(b)." *Id.* The court

declined to give the instruction, stating in part:

I think that the measuring stick is the evidence that was heard in
the case. The only evidence that is arguably or questionably
could be construed as in favor of self-defense was his own
statement which he said he pushed her away from him. I don't
think that that indicates that she was an initial aggressor. There's
no evidence he had any injuries . . . .

*Id.* at 115.

The jury found Steverson guilty of battery as a class B misdemeanor, he admitted to the enhancement to a level 5 felony, and the court sentenced him to five years for the level 5 felony to be served concurrently with a one-year sentence for the level 6 felony for attempted invasion of privacy.

## *Discussion*

## I.

The first issue is whether the trial court abused its discretion in excluding evidence of B.C.'s pending CHINS case. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001).

Steverson argues that the trial court erred in failing to admit evidence of the "potential consequences that smoking methamphetamine would have in [B.C.'s] pending CHINS case," Appellant's Brief at 11, under a theory that B.C. had a motive to lie to obtain a leaner consequence; that is, she "had reason to make herself look sympathetic to avoid jail time." Appellant's Reply Brief at 5. In support, he points to the fact that she did not receive the executed sentence she anticipated after admitting to smoking methamphetamine but was offered the option of completing an inpatient program instead. He argues the trial court

erred in making a factual determination about B.C.'s credibility rather than leaving that matter for the jury, and he contends that the State, in failing to argue that the testimony does not demonstrate an interest of B.C. to pin her "decision to smoke methamphetamine on pressure from Steve[r]son, rather than her own personal choice," concedes the consideration of relevancy. Appellant's Brief at 12.

[13] He relies upon *Mitchell v. State*, in which this Court stated in a footnote:

> "A witness's bias, prejudice or ulterior motives are always relevant at trial in that they may discredit her or affect the weight of her testimony." *Dyson v. State*, 692 N.E.2d 1374, 1376 (Ind. Ct. App. 1998) (interpreting Ind. Evidence Rule 616). However, Mitchell concedes on appeal that he did not offer the CHINS evidence for the purposes identified in Evidence Rule 616.[1]

730 N.E.2d 197, 197 n.4 (Ind. Ct. App. 2000), *trans. denied*. He claims that, had Mitchell's counsel offered the evidence in question under Ind. Evidence Rule 616, the testimony would have been admissible and that Mitchell's motives are no different than those presented here; *i.e.*, B.C.'s motive to identify Steverson as the aggressor to receive more lenient treatment in the CHINS matter.

[14] The State maintains that the facts do not support Steverson's defense theory. It argues that she was completely honest and admitted to her methamphetamine

---

[1] Ind. Evidence Rule 616 specifies that "[e]vidence that a witness has a bias, prejudice, or interest for or against any party may be used to attack the credibility of the witness."

use and that it did not give rise to a motive for dishonesty "in the case of B.C.'s relationship with CHINS," where "she admitted her drug use to CHINS and did not expect parent-time repercussions." Appellee's Brief at 12. It further argues that the drug use, which had nothing to do with the injuries Steverson inflicted on B.C., was irrelevant and inadmissible.

[15]     We note that Ind. Evidence Rule 616 provides for the admission of evidence showing bias or prejudice of a witness without any qualifications. *See Ingram v. State*, 715 N.E.2d 405, 407 (Ind. 1999). However, it "should be read in conjunction with Rule 403's required balancing of probative value against the danger of unfair prejudice." *Id.* Ind. Evidence Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

[16]     The record reveals that, during the offer of proof, B.C. indicated that, at the time of the incident, she had a pending CHINS matter relating to one child and was participating in CHINS drug court. She indicated a court held her in contempt for a violation sometime before May 17th but suspended the executed sentence. When asked about the violation, she stated that she was not doing what she was supposed to be doing and was not participating in drug tests. B.C. testified that she served seven days and then received inpatient treatment.

[17]    While B.C. stated she had been on "thin ice for awhile" and agreed with various statements of Steverson's counsel regarding an interest to not obtain a positive drug test because, as he suggested, it would trigger an additional violation report, she indicated she had not believed she would lose custody of her children, had not fabricated a story to avoid the sanction of the CHINS drug court, and had never denied smoking methamphetamine to anyone. When asked whether she tested positive or whether she "just sa[id], I smoked," she answered: "I told them." Transcript Volume II at 55.

[18]    To the extent Steverson argues that the testimony about the potential consequences in B.C.'s pending CHINS case is relevant to the charge facing him, we note the court found that he had not established a particular bias that B.C. held against him and that it could not attribute her receipt of less than the full ninety-day sanction to anything. We further observe that, while B.C. indicated she told Detective Turpin and the hospital staff at an earlier time that she was forced to smoke meth, Steverson does not point to the record to indicate that B.C. told persons involved in the CHINS case that he forced her to smoke. We conclude under these circumstances that the court did not err or abuse its discretion in excluding the evidence of B.C.'s CHINS case.

## II.

[19]    The next issue is whether the trial court abused its discretion by rejecting the proposed jury instruction on the use of force to protect person or property. Steverson maintains the evidence supported the tendering of the instruction. He

asserts defense counsel based the request "from a video clip in which Steverson told the detective he was pushing B.C. off of him." Appellant's Brief at 18 (citing Transcript Volume II at 113). He argues that the court made an erroneous factual determination in deciding his statement during the interview did not indicate B.C. was the initial aggressor. He further argues: the "court concedes" that the instruction was supported by the evidence; the court did not address whether the instruction was a correct statement of the law or whether it was repeated by another instruction; and the prosecutor did not object that the defense failed to meet the required elements for tendering a jury instruction. *Id.* at 19.

[20] The State responds the record lacks evidence that B.C. was an initial aggressor or that Steverson feared for his life, safety, or health. It contends the evidence demonstrates that "the victim's injuries were visible, and [Steverson] showed no signs of injury." Appellee's Brief at 15 (citing State's Exhibits 1-28, 86-87). It further maintains that the decision to reject the instruction was harmless and did not affect Steverson's rights "given the large bulk of evidence rebutting any false claim to self-defense." *Id.* at 16.

[21] The purpose of an instruction is "to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Overstreet v. State*, 783 N.E.2d 1140, 1163 (Ind. 2003), *cert. denied*, 540 U.S. 1150, 124 S. Ct. 1145 (2004). Instruction of the jury is generally within the discretion of the trial court and is reviewed only for an abuse of that discretion. *Id.* at 1163-1164. A trial

court erroneously refuses to give a tendered instruction, or part of one, if: (1) the instruction correctly sets out the law; (2) evidence supports the giving of the instruction; and (3) the substance of the tendered instruction is not covered by the other instructions given. *See id.* at 1164. Before a defendant is entitled to a reversal, he must affirmatively show that the erroneous instruction prejudiced his substantial rights. *Lee v. State*, 964 N.E.2d 859, 862 (Ind. Ct. App. 2012) (citing *Gantt v. State*, 825 N.E.2d 874, 877 (Ind. Ct. App. 2005)), *trans. denied*.

[22] As set out above, it is Steverson's burden to demonstrate that the evidence supported giving the instruction. Steverson points only to his response to Detective Turpin's inquiry into his injuries. We agree with the trial court that his statement does not indicate that B.C. was the initial aggressor. Based on the record, we cannot say that Steverson has demonstrated he was protecting himself from what he reasonably believed to be the imminent use of unlawful force. *See Dixson v. State*, 22 N.E.3d 836, 839 (Ind. Ct. App. 2014) ("When a case does not involve deadly force, a defendant claiming self-defense must show that he was protecting himself from what he 'reasonably believe[d] to be the imminent use of unlawful force.'") (quoting Ind. Code § 35-41-3-2(c)), *trans. denied*. We find that the trial court did not err or abuse its discretion in declining to give the proposed instruction.

[23] For the foregoing reasons, we affirm Steverson's conviction.

[24] Affirmed.

Baker, J., and Riley, J., concur.